McMILLAN, Judge.
 

 The appellant, Christopher Shane Hyde, was convicted of murdering June Williams, Randle Lane,
 
 [1]
 
 and Ricky Peterson by one act or pursuant to one scheme or course of conduct and for murdering Lane and Peterson during the course of a robbery, offenses defined as capital by § 13A-5-40(a)(10), Ala.Code 1975, and § 13A-5-40(a)(2), Ala.Code 1975. The jury, by a vote of 10 to 2, recommended that Hyde be sentenced to death. The circuit court followed the jury’s recommendation and sentenced Hyde to death.
 

 The State’s evidence tended to show the following. On March 26, 2003, Archie Tingle discovered the bodies of Williams, Lane, and Peterson in the Bell Funeral Home in Sumiton. The forensic pathologist testified that all three victims died as a result of gunshot wounds. Williams and Peterson died from bullet wounds to the head. Lane died as a result of a bullet that entered his chin, exited through his
 
 *1002
 
 neck, reentered his chest, and lacerated his aorta. Lane died of exsanguination— he bled to death.
 

 Tingle testified that immediately before he discovered the bodies he observed a young white male riding a little red bicycle in the area around the funeral home. He saw the man walk from the funeral home to Peterson’s green pickup truck, put his bicycle in the back of the truck, and drive off. After the man left, Tingle went into the funeral home to see if Peterson had loaned the man his truck. Tingle discovered the three bodies and telephoned the police.
 

 At the time of the murders Hyde was living in a mobile home with his stepfather’s brother, Jerry Griffis, his wife, Angela, and their 10-year-old daughter. Their daughter had a little red bicycle that Hyde had started riding about five days before the murders. On the day of the murders, Angela Griffis said that Hyde asked if he could use her daughter’s bicycle. She said that he left the mobile home to go to the bus stop where her daughter had left the bicycle before getting on the bus to go to school. When he came back later that day, she said, he was riding
 
 the
 
 bicycle.
 

 Cynthia Green testified that she was cleaning the Sumiton First Baptist Church on the morning of March 26, 2003, when she heard a loud knock on the door. She said that a young male, whom she identified at trial as Hyde, was at the door and asked to use the bathroom. She said that he had been riding a red bicycle. Green did not let Hyde enter the church and he left. The Sumiton First Baptist Church is near the Bell Funeral Home.
 

 After discovering the bodies, police issued a be-on-the-lookout, “BOLO,” alert for Peterson’s green truck. The truck was discovered abandoned at a Texaco gasoline station. Behind the station was the trailer park where Hyde had been living with the Griffis family. Police conducted a search of the trailer park and spoke to some of the residents. Angela Griffis told police that Hyde had been picked up by his sister and had left the trailer park. Jerry Griffis said that after police left, he remembered that Hyde had earlier gone to the back porch, where they put their garbage. He searched through the four trash bags. In one bag Griffis discovered a gun, two billfolds belonging to the deceased male victims, and a set of keys. Forensic tests identified the gun as the gun used to murder all three victims.
 

 The State’s evidence also showed that Hyde’s sister took Hyde to Birmingham and dropped him at the outskirts of town. Hyde went to the Greyhound bus station and purchased a ticket in his name to Atlanta, Georgia. Local authorities notified Atlanta law enforcement that he would be arriving in Atlanta on a particular bus and requested that they detain Hyde. Hyde was taken into custody as he left the bus in Atlanta. Investigator Frank Cole of the Walker County District Attorney’s Office and three law-enforcement personnel went to Atlanta to escort Hyde to Alabama. When the officers returned to Walker County with Hyde, they questioned him. Hyde confessed to killing Williams, Lane, and Peterson, and to taking Lane’s and Peterson’s wallets.
 

 The jury convicted Hyde of three counts of capital murder for murdering Lane and Peterson during the course of a robbery and for murdering Williams, Lane, and Peterson pursuant to one act or pursuant to one course of conduct. A separate sentencing hearing was held before the same jury. The jury recommended, by a vote of 10 to 2, that Hyde be sentenced to death. The circuit court ordered that a presen-tence report be prepared. See § 13A-5-47(b), Ala.Code 1975. The court then held
 
 *1003
 
 a separate sentencing hearing and sentenced Hyde to death. This appeal, which is automatic in a case involving the .death penalty, followed. See ,§ 13A-5-53, Ala. Code 1975.
 

 Standard of Review
 

 Because Hyde has been sentenced to death, this Court must review the proceedings in the circuit court for “plain error.” Rule 45A, Ala.R.App.P., states:
 

 “In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
 

 In describing this standard of review the Alabama Supreme Court has stated:
 

 “ ‘ “ ‘Plain error’ arises only if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.” ’
 
 Ex parte Womack,
 
 435 So.2d 766, 769 (Ala.1983) (quoting
 
 United States v. Chaney,
 
 662 F.2d 1148, 1152 (5th Cir.1981)).
 
 See also Ex parte Woodall,
 
 730 So.2d 652 (Ala.1998). ‘ “In other words, the plain-error exception to the contemporaneous objection rule is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.’ ” ’
 
 Ex parte Land,
 
 678 So.2d 224, 232 (Ala. 1996) (quoting
 
 United States v. Young,
 
 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (quoting in turn
 
 United States v. Frady,
 
 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982))). ‘To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s “substantial rights,” but it must also have an unfair prejudicial impact on the jury’s deliberations.’
 
 Hyde v. State,
 
 778 So.2d 199, 209 (Ala. Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001). This Court may take appropriate action when the error
 
 ‘has or probably has adversely affected
 
 the substantial rights of the appellant.’ Rule 45A, Ala. R.App.P. ‘[A] failure to object at trial, while not precluding our review, will weigh against any claim of prejudice.’
 
 Ex parte Woodall,
 
 730 So.2d at 657 (citing
 
 Kuenzel v. State,
 
 577 So.2d 474 (Ala. Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991)).”
 

 Ex parte Bryant,
 
 951 So.2d 724, 727 (Ala.2002)(emphasis added).
 

 Gtiilt-Phase Issues
 

 I.
 

 Hyde first argues that the circuit court erred in denying his motion for a change of venue. He asserts that he was unable to obtain a fair and impartial trial in Walker County because, he says, of the prejudicial pretrial publicity that surrounded the case.
 

 When reviewing a ruling on a motion for a change of venue, we consider the following:
 

 “ ‘ “A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity might have in a particular case. The trial court has the best opportunity to evaluate the effects of any pretrial publicity on the community as a whole and on the individual members of the jury venire. The trial court’s ruling on a motion for a change of venue will be reversed only when there is a showing that the trial court has abused its discretion.
 
 Nelson v.
 
 
 *1004
 

 State,
 
 440 So.2d 1130 (Ala.Cr.App. 1983).”
 

 “
 
 ‘Joiner v. State,
 
 651 So.2d 1155, 1156 (Ala.Cr.App.1994).’
 

 “Clemons v. State,
 
 720 So.2d 961, 977 (Ala.Cr.App.1996), affd, 720 So.2d 985 (Ala.1998), cert. denied, 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906 (1999). ‘The mere fact that publicity and media attention were widespread is not sufficient to warrant a change of venue. Rather,
 
 Ex parte Grayson
 
 [, 479 So.2d 76 (Ala.1985),] held that the appellant must show that he suffered actual prejudice or that the community was saturated with prejudicial publicity.’
 
 Slagle v. State,
 
 606 So.2d 193, 195 (Ala.Cr.App. 1992). ‘ “Moreover, the passage of time cannot be ignored as a factor in bringing objectivity to trial.” ’
 
 Whisenhant v. State,
 
 555 So.2d 219, 224 (Ala.Cr.App. 1988), aff'd, 555 So.2d 235 (Ala.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990) (citations omitted) (quoting
 
 Dannelly v. State,
 
 47 Ala.App. 363, 254 So.2d 434, cert. denied, 287 Ala. 729, 254 So.2d 443 (1971)).
 

 “ ‘In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated “actual prejudice” against him on the part of the jurors; 2) when there is “presumed prejudice” resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected.
 
 Sheppard v. Maxwell,
 
 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966);
 
 Rideau [v. Louisiana,
 
 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) ];
 
 Estes v. Texas,
 
 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965);
 
 Ex parte Grayson,
 
 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985);
 
 Coleman v. Zant,
 
 708 F.2d 541 (11th. Cir.1983).’
 

 “Hunt v. State,
 
 642 So.2d 999, 1042-43 .(Ala.Cr.App.1993), aff'd, 642 So.2d 1060 (Ala.1994).”
 

 Samra v. State,
 
 771 So.2d 1108, 1113 (Ala. Crim.App.1999).
 

 Hyde makes no claim of actual prejudice; therefore, Hyde must satisfy the presumed-prejudice standard. When describing the heavy burden of establishing presumed prejudice, the Alabama Supreme Court has stated:
 

 “To satisfy her burden of proof in the present case, [the defendant] had to establish that prejudicial pretrial publicity has so saturated Lamar County as to have a probable prejudicial impact on the prospective jurors there, thus rendering the trial setting inherently suspect. This required a showing that a feeling of deep and bitter prejudice exists in Lamar County as a result of the publicity.
 
 Holladay v. State,
 
 549 So.2d 122 (Ala.Crim.App.1988), aff'd,
 
 Ex parte Holladay,
 
 549 So.2d 135 (Ala.1989), cert. denied, [493] U.S. [1012], 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).”
 

 Ex parte Fowler,
 
 574 So.2d 745, 747-48 (Ala.1990).
 

 In this case, at the pretrial hearing on the motion for a change of venue, Hyde presented no copies of newspaper articles or of any other media coverage of the case. Nor were any articles attached to his written motion for a change of venue.
 

 In
 
 Lee v. State,
 
 898 So.2d 790, 867 (Ala.Crim.App.2001)(opinion on return to remand), we stated:
 

 “The appellant filed a motion for a change of venue in which he argued that he had been prejudiced by pretrial publicity. Specifically, he contended that at least two area newspapers had published articles about the case and that radio and television stations had broadcast
 
 *1005
 
 similar publicity in the area. However, he did not attach copies of the newspaper articles or transcripts of the broadcasts he referenced. His bare allegations about prejudicial publicity were not sufficient to prove that the media attention inflamed or saturated the community so that there was an emotional tide against him. Accordingly, he did not show that the pretrial publicity in this case was so inherently or presumptively prejudicial as to constitute one of those ‘extreme situations’ that warrant a presumption of prejudice based on pretrial publicity.”
 

 See also
 
 Spurgeon v. State,
 
 560 So.2d 1116, 1122 (Ala.Crim.App.1989) (“The appellant did not introduce any newspaper articles or other examples of media coverage. Thus, the appellant has not shown that the media coverage of this case ‘saturated the community’ with prejudicial publicity.
 
 Ex parte Kennedy,
 
 472 So.2d 1106 (Ala. 1985).”).
 

 Moreover, the voir dire examination of the prospective jurors does not support Hyde’s assertion that the community was so saturated with prejudicial pretrial publicity that he was unable to obtain a fair trial. The following occurred during voir dire:
 

 “[Prosecutor]: ... How many of you have read about this in, say, the
 
 Mountain Eagle
 
 or the
 
 Birmingham News
 
 or seen it on TV or something? Okay. Thank you. A number of you.
 

 “Let’s call this media publicity: TV, radio, newspaper, something like that. The Judge will tell you that the only evidence that you can consider is evidence that will come from the witness stand, or other things that he may tell you that are to be accepted by you as evidence such as stipulations or an agreement between the parties. With that in mind and the only evidence that you can consider is what you hear and see or what you’re told is evidence by the Judge, from those of you that have read the newspaper or watched TV or a radio show, can you put what you’ve heard out of your mind, or read out of your mind, or seen out of your mind, and base your verdict solely on evidence that comes from that witness stand? Is there anybody that can’t do that, let me say that?
 

 “(No response.)
 

 “[Prosecutor]: By your silence — and if this is not correct let me know. By your silence each and every one of you can put aside anything that you have read in a newspaper, heard on TV or on the radio and sit in that jury box and base your verdict on evidence that comes from the witness stand and the Judge and the law as the Judge will give it to you, you all can do that?”
 

 (R. 362-68.) Although several jurors indicated that their verdict might be affected because of information surrounding the murders that they had gained from individuals in the community, no prospective juror indicated that any pretrial publicity would adversely influence his or her verdict. Those that had a preconceived view of Hyde’s guilt based on talk in the community were struck for cause. The record shows that the circuit court did not err in denying Hyde’s motion for a change of venue.
 

 II.
 

 Hyde argues that the circuit court erred in allowing Hyde to be restrained during the trial with a “stun belt” and leg restraints. He cites
 
 Snyder v. State,
 
 893 So.2d 488 (Ala.Crim.App.2003), and argues that the court erred in not holding a hearing and making specific findings as to why it was necessary to use such excessive means to restrain Hyde.
 

 
 *1006
 
 First, the record is devoid of any indication that Hyde was wearing a “stun belt” or leg shackles during the trial. The only point in the record where any type of restraints are mentioned is during the motion for a new trial. At that hearing, defense counsel stated that Hyde had been “secured” during the trial. However, we do not know what measures were taken to “secure” Hyde. Hyde never objected during the course of trial concerning the court’s method of restraining him; therefore, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
 

 Even if the record affirmatively showed that Hyde was wearing a “stun belt,” we would find no plain error. As we stated in
 
 Belisle v. State,
 
 11 So.3d 256, 281-82 (Ala.Crim.App.2007):
 

 “We have approved of the use of a similar device — a ‘stun belt’—to maintain security in a courtroom. See Snyder
 
 v. State,
 
 893 So.2d 488 (Ala.Crim. App.2003). However, we have never had occasion to address this issue under the ‘plain error’ standard of review.
 

 “Belisle relies on
 
 [United States v.] Durham[
 
 287 F.3d 1297 (11th Cir. 2002),] to support this argument. However, we believe that this case is more similar to
 
 Scieszka v. State,
 
 259 Ga.App. 486, 578 S.E.2d 149 (2003). The Georgia Court of Appeals in
 
 Scieszka
 
 distinguished the case of
 
 Durham,
 
 based on the fact that the issue had never been presented to the trial court. The court stated:
 

 “ ‘As an initial matter, we note that there is nothing in the record indicating that it was the trial court that required Scieszka to wear the stun belt. Scieszka’s trial attorney never objected to the belt or otherwise brought the matter to the trial court’s attention, and there was accordingly no ruling on the matter by the court.
 

 “ ‘Our Supreme Court has held that the use “of a remedial electronic security measure” is permissible where it is shielded from the jury’s view and where there is no evidence that defendant was harmed by its use.
 
 Young v. State,
 
 269 Ga. 478, 479(2), 499 S.E.2d 60 (1998). In the
 
 Young
 
 case, the court found that there was nothing in the record to show that the use of such an electronic device was “so inherently prejudicial as to pose an unacceptable threat to his right to a fair trial.” (Citation and punctuation omitted.) Id. In another case, the Supreme Court rejected the defendant’s argument regarding the use of a stun belt, finding that there was “nothing in the record to support [the defendant’s] contention that the device [ (although not visible to the jury) ] nonetheless had a detrimental psychological effect on his ability to participate in the trial.”
 
 Brown v. State,
 
 268 Ga. 354, 359-360(7), 490 S.E.2d 75 (1997). And in
 
 Stanford v. State,
 
 272 Ga. 267, 271(8), 528 S.E.2d 246 (2000), the court again found no merit to the defendant’s arguments regarding the use of an electronic security device because he failed to object to the device and because it was not visible to the jury.
 

 “ ‘Scieszka’s argument must similarly fail because he raised no objection to the use of the stun belt and thus did not obtain a ruling from the trial court on the issue. Moreover, the record is devoid of any evidence of harm or prejudice arising from the use of the stun belt at his trial.
 

 “ ‘And contrary to Scieszka’s assertion, the recent opinion by the Eleventh Circuit Court of Appeals in
 
 United States v. Durham,
 
 287 F.3d 1297
 
 *1007
 
 (11th Cir.2002), does not require a different result. In
 
 Durham,
 
 the Eleventh Circuit expressed serious concerns regarding the use of these devices and their effect on a defendant’s ability to participate in his defense. Id. at 1305-1306. Nevertheless, the defendant in that case had filed a motion seeking to prohibit the stun belt’s use, and the district court had ruled that the device could be used in light of the defendant’s history of escape attempts. Id. at 1302-1303. The Eleventh Circuit remanded the case, requiring the district court to make factual findings regarding the use of the stun belt and to consider on the record the use of less restrictive alternatives. Id. at 1307-1309. Thus,
 
 Durham
 
 is distinguishable from this case because the use of the stun belt in that case was court-sanctioned, following the defendant’s objection.’
 

 “259 Ga.App. at 487-88, 578 S.E.2d at 150-51. For the reasons discussed in
 
 Scieszka,
 
 we refuse to find plain error when the issue was not brought to the court’s attention, when there is no evidence that Belisle was prejudiced, and when Belisle’s substantial rights have not been affected. Rule 45A, Ala.R.App. P.”
 

 Nothing in the record suggests that the jury was aware that Hyde was restrained. For the reasons discussed in
 
 Belisle,
 
 we find no plain error. See Rule 45A, Ala. R.App.P.
 

 Moreover, the use of leg shackles does not automatically constitute reversible error. Although Hyde was restrained in some manner, he did not stand when the judge entered the courtroom so the jury could not see the restraints.
 
 [2]
 
 In addressing a similar issue, this Court in
 
 Brown v. State,
 
 982 So.2d 565 (Ala.Crim.App.2006), stated:
 

 “In Alabama, it is clear that espoused state concerns of safety in the courtroom, as well as the prevention of a defendant’s escape, are legitimate concerns that properly justify the use of restraints. Thus, in
 
 Peraita v. State,
 
 897 So.2d 1161, 1208 (Ala.Crim.App. 2003), aff'd, 897 So.2d 1227 (Ala.2004), this court held that the trial court properly allowed the defendant to be shackled, based on his prior convictions and sentences, for safety purposes and because he might try to escape. In holding that there was no plain error by the trial court for allowing this defendant to appear in shackles, this court stated:
 

 “ ‘Moreover, “[i]t is not always reversible error for a defendant to be handcuffed or shackled in front of the jury.”
 
 Perkins v. State,
 
 808 So.2d 1041, 1079 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001), vacated on other grounds, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830, on remand, 851 So.2d 453 (Ala.2002). In fact, “[i]t is in the sound discretion of the trial court to restrain the defendant, and such discretion should not be disturbed,
 
 Martin v. State,
 
 51 Ala.App. 405, 286 So.2d 80, 85 (1973).”
 
 Brock v. State,
 
 555 So.2d 285, 289 (Ala.Crim. App.1989).’ ”
 

 982 So.2d at 595. We likewise find no plain error in this case.
 

 III.
 

 Hyde next argues that the circuit court erred by failing to sua sponte dismiss the entire jury venire after a prospective juror stated that the alleged murder weapon had been stolen. He asserts: “The trial court’s failure to sua sponte dismiss the venire and empanel a new
 
 *1008
 
 venire constituted ‘plain error,’ because it resulted in the seating of jurors who had heard that Mr. Hyde ‘stole’ the alleged murder weapon.” (Hyde’s brief at p. 36.)
 

 The record shows that the following occurred during voir dire examination:
 

 “The Court: ... Anyone else that knows anything about the facts of the case?
 

 “Prospective juror [B.G.]: My boss’s sister, her gun was the one that was used in the killing. Her house was broken into before, and it was the gun that was used in the killing.”
 

 (R. 334.) Hyde failed to object during the voir dire examination; thus, we review this issue for plain error. See Rule 45A, Ala. R.App.P. The record does show that, during the hearing on the motion for a new trial, counsel raised this issue and candidly admitted that he did not know if any other members of the venire had heard the comment.
 

 In
 
 Williams v. State,
 
 710 So.2d 1276, 1314 (Ala.Crim.App.1996), we addressed a similar situation. In
 
 Williams,
 
 we found no plain error after a prospective juror indicated during voir dire that the insanity defense was “trumped up” and that a sentence of life imprisonment without parole does not necessarily mean that the individual will never get out of prison. We stated:
 

 “From defense counsel’s failure to move to have a new venire empaneled, to request that the venire be further polled, or to ask that the court give the venire curative instructions, it is reasonable to assume that, at the time the above responses were made, defense counsel did not believe that L.M.’s comments prejudiced the appellant. Defense counsel, therefore, ‘failed to pursue the course of action necessary to investigate the potential contamination of [his] client[’s] jury.’
 
 See Battle v. State,
 
 574 So.2d 943, 946 (Ala.Cr.App.1990) (quoting
 
 Gibson v. State,
 
 555 So.2d 784, 797 (Ala.Cr.App. 1989)).”
 

 For the reasons discussed in
 
 Williams,
 
 we find no plain error.
 

 IV.
 

 Hyde next argues that the circuit court erred in refusing to remove four prospective jurors, J.A., S.A., J.M., and B.M.,
 
 [3]
 
 for cause after they indicated both during voir dire and in their juror questionnaires that they had a fixed opinion of Hyde's guilt.
 
 [4]
 

 Initially, we note that neither the venire list of the jurors called for service the week of Hyde’s trial nor the strike list is contained in the record. The record does contain the names of 16 prospective jurors who were chosen to sit on Hyde’s jury. (Because of the nature of the offense, the court elected to have four alternates.) Thus, we do not know what party struck what jurors or what jurors were removed last. However, it does appear that none of the challenged jurors served on Hyde’s jury and that they were struck by either Hyde or the State.
 

 As we stated in
 
 Calhoun v. State,
 
 932 So.2d 923 (Ala.Crim.App.2005):
 

 “The Alabama Supreme Court in
 
 Bethea v. Springhill Memorial Hospital,
 
 833 So.2d 1 (Ala.2002), returned to the harmless-error analysis when reviewing a circuit court’s refusal to remove a pro
 
 *1009
 
 spective juror for cause. The Supreme Court stated:
 

 “ ‘The application of a “harmless-error” analysis to a trial court’s refusal to strike a juror for cause is not new to this Court; in fact, such an analysis was adopted as early as 1909:
 

 “ ‘ “The appellant was convicted of the crime of murder in the second degree. While it was error to refuse to allow the defendant to challenge the juror C.S. Rhodes for cause, because of his having been on the jury which had tried another person jointly indicted with the defendant, yet it was error without injury, as the record shows that the defendant challenged said juror peremptorily, and that, when the jury was formed the defendant had not exhausted his right to peremptory challenges.”
 

 “
 
 ‘Turner v. State,
 
 160 Ala. 55, 57, 49 So. 304, 305 (1909). However, in
 
 Swain v. Alabama,
 
 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), overruled on other grounds,
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court stated, in dicta, that “[t]he denial or impairment of the right is reversible error
 
 without a showing of prejudice.”
 
 (Emphasis added [in
 
 Bethea].)
 
 Some decisions of this Court as well as of the Alabama Court of Criminal Appeals reflect an adoption of this reasoning. See
 
 Dixon v. Hardey,
 
 591 So.2d 3 (Ala.1991);
 
 Knop v. McCain,
 
 561 So.2d 229 (Ala.1989);
 
 Ex parte Rutledge,
 
 523 So.2d 1118 (Ala.1988);
 
 Ex parte Beam,
 
 512 So.2d 723 (Ala.1987);
 
 Uptain v. State,
 
 534 So.2d 686, 688 (Ala.Crim.App.1988) (quoting
 
 Swain
 
 and citing
 
 Beam
 
 and Rutledge);
 
 Mason v. State,
 
 536 So.2d 127, 129 (Ala. Crim.App.1988) (quoting Uptain).
 

 “ ‘... [T]his Court has returned to the “harmless-error” analysis articulated in the
 
 Ross v. Oklahoma,
 
 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), and
 
 [United States v.] Martinez-Salazar,
 
 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), decisions. Because a defendant has no right to a perfect jury or a jury of his or her choice, but rather only to an “impartial” jury, see Ala. Const. 1901 § 6, we find the harmless-error analysis to be the proper method of assuring the recognition of that right.
 

 “ ‘In this instance, even if the Be-theas could demonstrate that the trial court erred in not granting their request that L.A.C. be removed from the venire for cause (an issue we do not reach), they would need to show that its ruling somehow injured them by leaving them with a less-than-impartial jury. The Betheas do not proffer any evidence indicating that the jury that was eventually impaneled to hear this action was biased or partial. Therefore, the Betheas are not entitled to a new trial on this basis.’
 

 “833 So.2d at 6-7 (footnotes omitted). See also
 
 Dailey v. State,
 
 828 So.2d 340 (Ala.2001). As was the case in
 
 Bethea,
 
 Calhoun offers no evidence that the jury ultimately impaneled was biased; therefore, if error occurred it was harmless.”
 

 932 So.2d at 944-45 (footnote omitted). But see
 
 General Motors Corp. v. Jernigan,
 
 883 So.2d 646 (Ala.2003) (harmless-error analysis does not apply when the circuit court erroneously denied five challenges for cause).
 

 Section 12-16-150(7), Ala.Code 1975, provides that a prospective juror may be removed for cause if “he has a fixed opinion as to the guilt or innocence of the defendant which would bias his ver-
 
 *1010
 
 diet.” A juror may also be removed if he has an “absolute bias” against or in favor of the defendant. See
 
 Johnson v. State,
 
 611 So.2d 506, 510 (Ala.Crim.App.1992).
 

 A.
 

 First, Hyde challenges the court’s failure to remove prospective juror J.A. for cause, because, he argues, she indicated that she could not follow the law regarding Hyde’s right not to testify.
 

 The following occurred during voir dire examination:
 

 “[Prosecutor]: [J.A.], if you are chosen for the jury and you’re in the box there and the judge will give you an oath similar to the one you’ve already had already and in that oath you will be required to follow the law as the Judge gives it to you, and at some point in the trial the Judge will instruct you that if the defendant does not take the stand, you can’t hold that against him, you understand what I mean?
 

 “[Prospective juror J.A.]: Yes, sir.
 

 “[Prosecutor]: Now, if you’ve taken an oath to be on the jury and follow the law, and the Judge says if the defendant doesn’t take the stand, you can’t use that against him or you can’t hold that against him, you understand what I’m saying?
 

 “[J.A.]: Yes, sir.
 

 “[Prosecutor]: Can you follow your oath and follow the Judge’s instructions? “[J.A.]: Sure, yes, sir.
 

 “[Prosecutor]: So even though personally you think that a defendant should testify, if it’s the law he doesn’t have to, then you’ll keep your oath and you’ll follow the law as Judge Selman gives it to you?
 

 “[J.A.]: Yes, sir.
 

 “[Prosecutor]: Thank you, ma’am.
 

 “[Defense counsel]: [J.A.], I understand under oath you feel like that you do not — you won’t take into consideration that he did not testify; is that correct? “[J.A.]: Yes, sir.
 

 “[Defense counsel]: However, emotionally and mentally will you hold that against him?
 

 “[J.A.]: No.
 

 “[Defense counsel]: Well, I’m a little confused about his answer to this question then, because you answered no. You stated you cannot accept this rule of law, and you just answered that just two minutes ago.
 

 “The Court: It’s okay to change your answer. They’re trying to get the correct information is what they’re trying to do so just don’t worry about being backed into a corner. You just tell us what your thoughts are.
 

 “[Defense counsel]: We just need to know how you really feel about it.
 

 “[J.A.]: Ask me that again then.
 

 “[Defense counsel]: Will you be able to — can you accept the rule of law and follow it in your deliberations if he does not testify in court?
 

 “[J.A.]: Well, I really think that he should be able to testify, that he should.
 

 “[Defense counsel]: You believe he should testify?
 

 “[J.A.]: Right.
 

 “[Defense counsel]: And if he does not testify, would you hold that against him?
 

 “[J.A.]: Probably.
 

 “[Defense counsel]: Thank you.
 

 “The Court: [Prosecutor], anything else?
 

 “[Prosecutor]: If the Judge tells you you can’t hold it against him — you understand what I’m saying?
 

 “[J.A.]: Yes, sir.
 

 
 *1011
 
 “[Prosecutor]: Judge Selman ... will tell you you cannot hold it against him if he doesn’t testify; you understand that?
 

 “[J.A.]: Uh-huh.
 

 “[Prosecutor]: Will you follow Judge Selman’s instructions and not hold it against him?
 

 “[J.A.]: Well, I would have to then.
 

 “[Prosecutor]: So you could follow the Court’s instructions and base your verdict on the evidence?
 

 “[J.A.]: Yes.
 

 “[Prosecutor]: And if he for some reason chose not to testify and the Judge said you can’t hold that against him, you wouldn’t hold it against him; is that right?
 

 “[J.A.]: Well, if the Judge said I couldn’t.
 

 “[Prosecutor]: The Judge will tell you that.
 

 “[J.A.]: Yes.
 

 “[Prosecutor]: So you wouldn’t hold it against him?
 

 “[J.A.]: No.
 

 “[Prosecutor]: Because that would be a violation of your oath to follow his order?
 

 “[J.A.]: Yes, sir.
 

 “[Prosecutor]: And you’re sure you wouldn’t hold it against him if the Judge says you can’t?
 

 “[J.A.]: Yes. If he says I can’t, I wouldn’t.
 

 “[Prosecutor]: Okay. Thank you.
 

 “[Defense counsel]: Nothing further.”
 

 (R. 469-73.) Though J.A. initially stated that she would hold it against Hyde if he chose not to testify, the prosecutor rehabilitated the juror.
 

 “ ‘[J]urors who give responses that would support a challenge for cause may be rehabilitated by subsequent questioning by the prosecutor or the court.’
 
 Johnson v. State,
 
 820 So.2d 842, 855 (AIa.Crim.App.2000). ‘The crucial inquiry is whether the veniremen could follow the court’s instructions and obey his oath, notwithstanding his views on capital punishment.’
 
 McNabb v. State,
 
 887 So.2d 929, 944 (Ala.Crim.App.2001), quoting other cases.”
 

 Brownfield, v. State,
 
 [Ms. CR-04-0743, April 27, 2007] — So.3d -,-(Ala. Crim.App.2007). J.A. unequivocally stated, several times, that she would follow the law as instructed by the court and not consider the defendant’s failure to testify against him. The court did not err in refusing to remove this juror for cause. See
 
 Snyder v. State,
 
 893 So.2d 488 (Ala. Crim.App.2003).
 

 B.
 

 Second, Hyde argues that it was error for the court to not remove prospective juror S.A. for cause, because, he argues, this juror was biased against him.
 

 During voir dire S.A. initially indicated that, until a week before trial, she thought that Hyde had confessed. She also expressed doubts about the presumption of innocence. However, the following occurred during the individual voir dire of S.A.:
 

 “[Defense counsel]: We had you fill out a questionnaire yesterday?
 

 “[Prospective juror S.A.]: Yes, sir.
 

 “[Defense counsel]: Do you recall that? “[S.A.]: Yes, sir.
 

 “[Defense counsel]: Question 7, I don’t know if you remember this or not.
 

 “[S.A.]: May I.
 

 “[Defense counsel]: Sure. Look at 7a, if you will. Read 7a for us.
 

 “[S.A.]: ‘Because this is a criminal case, it is the law that Christopher Shane Hyde is presumed innocent throughout the entire trial and into the jury deliber
 
 *1012
 
 ations until such time as the jury may find him guilty beyond a reasonable doubt. Can you accept this rule of law and follow it in deliberations?’
 

 “I think I covered this when I spoke earlier.
 

 “[Defense counsel]: What was your answer there?
 

 “[S.A.]: Don’t know.
 

 “[Defense counsel]: You did not know?
 

 “[S.A.]: Yes, sir.
 

 “[Defense counsel]: So you did not answer yes at that point, right?
 

 “[S.A.]: Right. I answered ‘don’t know.’
 

 “[Defense counsel]: And is today that still your answer?
 

 “[S.A.]: No, I believe that I can follow the rule of law. I understand a little bit better now than I did. It’s the first time I’ve ever been here. I can say that, yes, I can accept the rule of law and follow it into deliberation, yes.”
 

 (R. 460-62.) Although S.A. initially expressed doubts about the judicial process, she was rehabilitated. Thus, the court did not err in refusing to remove S.A. for cause.
 

 C.
 

 Third, Hyde argues that prospective juror J.M. should have been removed for cause because he had views on the case based on the talk in the community, that he would have difficulty because of his acquaintance with the decedents, and that he would have difficulty following the rules of law concerning the burden of proof and the presumption of innocence.
 

 However, the record shows that when J.M. was questioned individually, he stated that he could base his decision on the evidence that was presented at trial and that he could follow the court’s instructions concerning the law. Thus, J.M. was rehabilitated, and the circuit court committed no error in denying Hyde’s challenge for cause of this prospective juror. See
 
 Brownfield v. State,
 
 supra.
 

 D.
 

 Fourth, Hyde argues that the court erred in failing to remove prospective juror B.M. for cause because she indicated during voir dire that it was Hyde’s responsibility to prove his innocence and because she indicated on her questionnaire that she would give more weight to a law-enforcement officer’s testimony than to the testimony of a witness not involved in law enforcement.
 
 [5]
 

 During individual voir dire, this juror indicated that she could set aside her opinions and follow the law as instructed by the court. She said: “I don’t always understand the judicial system, but I’ll do what the Judge tells me to do because it is the law.” Thus, the court committed no error in denying Hyde’s challenge for cause.
 

 Y.
 

 Hyde next argues that the circuit court erred in allowing Hyde’s confession to be received into evidence because, he argues, the totality of the circumstances showed that the statement was involuntary. Specifically, he argues that when he confessed he was sleep deprived and concerned that his sister would be prosecuted. He also asserts that his low IQ rendered him susceptible to police coercion.
 

 
 *1013
 
 When reviewing a ruling on the voluntariness of a confession we use the standard set out by the Alabama Supreme Court in
 
 McLeod v. State,
 
 718 So.2d 727 (Ala.1998). The Supreme Court stated:
 

 “For a confession, or an inculpatory statement, to be admissible, the State must prove by a preponderance of the evidence that it was voluntary.
 
 Ex parte Singleton,
 
 465 So.2d 443, 445 (Ala. 1985). The initial determination is made by the trial court.
 
 Singleton,
 
 465 So.2d at 445. The trial court’s determination will not be disturbed unless it is contrary to the great weight of the evidence or is manifestly wrong.
 
 Marschke v. State,
 
 450 So.2d 177 (Ala.Crim.App. 1984)....
 

 “The Fifth Amendment to the Constitution of the United States provides in pertinent part: ‘No person ... shall be compelled in any criminal case to be a witness against himself....’ Similarly, § 6 of the Alabama Constitution of 1901 provides that ‘in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself.’ These constitutional guarantees ensure that no involuntary confession, or other inculpatory statement, is admissible to convict the accused of a criminal offense.
 
 Culombe v. Connecticut,
 
 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961);
 
 Hubbard v. State,
 
 283 Ala. 183, 215 So.2d 261 (1968).
 

 “It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency.
 
 Bram v. United States,
 
 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In
 
 Culombe,
 
 367 U.S. at 602, 81 S.Ct. at 1879, the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, ‘if his
 
 will has been overborne’
 
 by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence.
 
 Id.
 
 (emphasis added).
 

 “The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the ‘totality of the circumstances.’
 
 Boulden v. Holman,
 
 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969);
 
 Greenwald v. Wisconsin,
 
 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see
 
 Beecher v. Alabama,
 
 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant’s will was overborne by coercion or inducement. See
 
 Ex parte Matthews,
 
 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992);
 
 Jackson v. State,
 
 562 So.2d 1373, 1380 (Ala.Crim. App.1990) (stating that, to admit a confession, a court must determine that the defendant’s will was not overborne by pressures and circumstances swirling around him);
 
 Eakes v. State,
 
 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is ‘whether the defendant’s will was
 
 overborne
 
 at the time he confessed’) (emphasis added).”
 

 718 So.2d at 729 (footnote omitted).
 

 “In order for a statement to be admissible, ‘[t]he trial judge need only be convinced from a
 
 preponderance of the evidence
 
 to find a confession to have been voluntarily made.’
 
 Jackson v. State,
 
 516 So.2d 726, 741 (Ala.Crim.App.1985), cit
 
 *1014
 
 ing
 
 Harris v. State,
 
 420 So.2d 812, 814 (Ala.Crim.App.1982) (emphasis added). See also
 
 Ex parte Williams,
 
 627 So.2d 999, 1003 (Ala.1993). Moreover, in cases involving conflicting evidence on the issue of voluntariness, the trial court’s determination is entitled to great weight on appeal.
 
 D.M.M. v. State,
 
 647 So.2d 57, 60 (Ala.Crim.App.1994). ‘ “ ‘Where the evidence of voluntariness is conflicting, and even where there is credible testimony to the contrary, the trial judge’s finding of voluntariness must be upheld unless
 
 palpably contrary to the weight of the
 
 evidence.’ ” ’
 
 Dixon v. State,
 
 588 So.2d 903, 908 (Ala.1991) (quoting
 
 Carr v. State,
 
 545 So.2d 820, 824 (Ala.Crim.App.1989)) (emphasis added). See also
 
 Ex parte Jackson,
 
 836 So.2d 979, 982 (Ala.2002).”
 

 Jones v. State,
 
 987 So.2d 1156, 1164 (Ala. Crim.App.2006). “We held in
 
 Dobyne v. State,
 
 672 So.2d 1319, 1337 (Ala.Crim.App. 1994),
 
 aff'd,
 
 672 So.2d 1354 (Ala.1995), that a defendant’s low IQ does not preclude a finding that a
 
 Miranda
 
 waiver was voluntary unless the defendant is so mentally impaired that he did not understand his
 
 Miranda
 
 rights.”
 
 Beckworth v. State,
 
 946 So.2d 490, 517 (Ala.Crim.App.2005).
 

 Before the Alabama Supreme Court’s decision in
 
 Holt v. State,
 
 372 So.2d 370 (Ala.1978), Alabama courts held that a threat to prosecute a family member did not render a statement involuntary because the benefit to the accused, i.e., saving a loved one from arrest and prosecution, was a “collateral benefit.” See
 
 Elmore v. State,
 
 223 Ala. 490, 137 So. 185 (1931). However, in
 
 Holt,
 
 the Supreme Court abolished the collateral-benefit rule. The relevant inquiry now is whether the promise or threat induced the defendant to make a statement.
 
 [6]
 

 Hyde relies on the case of
 
 Spano v. New York,
 
 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), to support his argument that his statement was involuntary. In
 
 Spano v. New York,
 
 the United States Supreme Court held that Spano’s confession was involuntary and due to be suppressed because his will was overborne by official pressures. Spano was a foreign-born 25-year-old who had had no previous history with law enforcement, had finished only one-half year of high school, had been asked only leading questions, had been interrogated for a solid eight hours during the night, and had been questioned by many different individuals before he confessed.
 

 In this case, Hyde moved to suppress his confession, and a suppression hearing was held before trial. Investigator Frank Cole of the Walker County District Attorney’s Office testified that he and several other officers went to Atlanta, Georgia, to escort Hyde back to Alabama. They arrived in Atlanta and spoke with Hyde at around 1:50 a.m. on the morning of March 27, 2003. Investigator Cole said that he read Hyde his
 
 Miranda’
 

 [7]
 

 rights and that Hyde signed a waiver-of-rights
 
 *1015
 
 form. Investigator Cole said that Hyde told him that he was tired and that he did not want to talk. They left Hyde at the police station. At approximately 9:00 a.m. on March 27, 2003, Hyde appeared at the Fulton County courthouse for an extradition hearing. At approximately 1:00 p.m., Investigator Cole said, when they were in his vehicle driving back to Alabama, Sgt. Barry Hogan read Hyde his
 
 Miranda
 
 rights. The following occurred:
 

 “[Prosecutor]: Anything happen on the way back?
 

 “[Investigator Cole]: I was getting a lot of phone calls and making a lot of phone calls back to other investigators and to our office and the Sheriffs Department, City of Sumiton. I talked to one officer about the defendant’s sister on the car phone, where I told the officer — I can’t recall exactly which officer it was I was talking to. I was talking to an officer that had asked me if we were going to reinterview the defendant’s sister, and I said yes. I said, ‘I’ll get to that when we get back.’ The defendant leaned up and said, ‘She didn’t have nothing to do with this.’
 

 “[Prosecutor]: That was not in response to a question?
 

 “[Investigator Cole]: That was not in response to a question.
 

 “[Prosecutor]: Did you follow that up with other questions?
 

 “[Investigator Cole]: No. I told him — a short while later we were driving and I said, ‘Shane,’ I said, ‘you sit back and when we get to Walker County you decide when I cross the county line, you can tell me to take you on to the jail, the Walker County jail, or if you want to tell your side of this, we’ll stop at my office on the way in.’ I said, ‘I’ll ask you that when we get back.’ And so we came across — entered into Sumiton, may have been at Rocky Hollow, I said, ‘Which is it?’ And he said, We’ll go to your office.’ We got to the office. He was reread his rights.”
 

 (R. 125-26.) Investigator Cole said that Hyde told them that he wanted to tell his side, that none of the officers offered him anything to make a statement and that he was not promised, threatened, coerced to confess, nor was any type of physical or psychological effort made to cause Hyde to confess.
 

 Hyde testified at the suppression hearing. He said that four officers escorted him from Atlanta to Walker County and that he had not gotten any sleep before the extradition hearing. He said that Cole told him that “I can prosecute your sister also.” Hyde testified that he took that as a threat because his sister was pregnant at the time of the murders. He also said that he overheard Cole say, “She can be prosecuted but I don’t think we’re going to go ahead and do it because we’re fixing to get a statement.” Hyde said that he was “badgered” about his sister. However, on cross-examination he said that Investigator Cole did not mention his sister by name; he just assumed that he was talking about his sister.
 

 Also, Hyde was evaluated at Taylor Hardin Secure Medical Facility before his trial. Hyde’s full-scale IQ was determined to be 89. Hyde had also had previous contact with law enforcement.
 

 When denying Hyde’s motion to suppress, the court stated:. “In listening to the tape and observing the easy flow of conversation and ease and willingness of Mr. Hyde’s statements to Mr. Cole, I find that the statement was voluntarily.” (R. 196.) We have reviewed the videotape of Hyde’s statement and find nothing to suggest that the statement was induced by any promises to Hyde or by any threats. The circuit court did not err in admitting Hyde’s confession.
 

 
 *1016
 
 VI.
 

 Hyde next argues that the circuit court erred in allowing photographs of the crime scene and of the victims’s injuries to be introduced because they were unduly gruesome, prejudicial, and repetitive.
 

 “ ‘Generally, photographs are admissible into evidence in a criminal prosecution “if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge.” ’
 
 Bankhead v. State,
 
 585 So.2d 97, 109 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala. 1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d, 625 So.2d 1146 (Ala.1993), quoting
 
 Magwood v. State,
 
 494 So.2d 124, 141 (Ala.Crim.App.1985), aff'd, 494 So.2d 154 (Ala.1986). ‘Photographic exhibits are admissible even though they may be cumulative, demonstrative of undisputed facts, or gruesome.’
 
 Williams v. State,
 
 506 So.2d 368, 371 (Ala.Crim.App.1986) (citations omitted). In addition, ‘photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.’
 
 Ex parte Siebert,
 
 555 So.2d 780, 784 (Ala.1989). ‘This court has held that autopsy photographs, although gruesome, are admissible to show the extent of a victim’s injuries.’
 
 Ferguson v. State,
 
 814 So.2d 925, 944 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001). ‘ “[A]utopsy photographs depicting the character and location of wounds on a victim’s body are admissible even if they are gruesome, cumulative, or relate to an undisputed matter.’”
 
 Jackson v. State,
 
 791 So.2d 979, 1016 (Ala.Crim.App.2000), quoting
 
 Perkins v. State,
 
 808 So.2d 1041, 1108 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001), judgment vacated on other grounds, 536 U.S. 953 (2002), on remand to, 851 So.2d 453 (Ala.2002).”
 

 Brooks v. State,
 
 973 So.2d 380, 393 (Ala. Crim.App.2007). The photographs were admissible even though they were gruesome and cumulative.
 

 Hyde also argues, citing
 
 Wesley v. State,
 
 32 Ala.App. 383, 26 So.2d 413 (1946), that his case should be reversed because some of the photographs were enlarged and they made the wounds appear larger than they were. Here, rulers were used in each photograph to ensure that the actual size of the injuries was not distorted. “The fact that the photographs were in color and were enlarged is of no particular significance as long as there was no distortion of the depiction of the injuries. [C. Gamble,]
 
 McElroy’s [Alabama Evidence],
 
 § 207.01(2)[ (3d ed. 1977) ];
 
 Harris v. Snider,
 
 223 Ala. 94, 134 So. 807 (1931);
 
 Braswell v. State,
 
 51 Ala.App. 698, 288 So.2d 757 (1974).”
 
 Bombailey v. State, 580
 
 So.2d 41, 46 (Ala.Crim.App.1990). These photographs were also admissible.
 

 Last, the crime-scene photographs were also properly admitted into evidence to aid the jury.
 

 “The photographs were admissible because they were relevant to show the crime scene and the injuries each victim suffered, and because they helped to illustrate the testimony given by the investigating officers concerning the crime scene, as well as to illustrate the testimony of the coroner concerning the type and extent of the wounds that caused the victims’ deaths.”
 

 Maxwell v. State,
 
 828 So.2d 347, 363 (Ala. Crim.App.2000). See also
 
 Ex parte Siebert,
 
 555 So.2d 780, 783 (Ala.1989). The circuit court committed no error in allow
 
 *1017
 
 ing the photographs to be received into evidence.
 

 VII.
 

 Hyde next argues that the circuit court erred in allowing the murder weapon, the two wallets, and a set of keys, found in a trash bag, to be received into evidence because, he argues, the search and seizure at which that evidence was collected was conducted by a private individual acting as an agent of the State and was in violation of the Fourth Amendment to the United States Constitution.
 

 Hyde never moved to suppress the items seized from the trash bag located on the Griffis family’s back porch. Therefore, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
 

 “A private citizen’s acts cannot constitute a search or seizure within the context of the Fourth Amendment unless the citizen is acting as an agent or instrument of the government. In order for a private search to be considered action by the government, the private actor must be regarded as having acted as an instrument or agent of the state.
 
 Coolidge v. New Hampshire,
 
 403 U.S. 443, 487, 91 S.Ct. 2022, 2049, 29 L.Ed.2d 564 (1971). The determination of this agency must be made on a case-by-case basis and in light of all of the circumstances. It is the defendant’s burden to establish by a preponderance of the evidence that a private party acted as a government instrument or agent.
 
 U.S. v. Feffer,
 
 831 F.2d 734, 739 (7th Cir. 1987). See also,
 
 United States v. Reed,
 
 15 F.3d 928, 931 (9th Cir.1994) (‘The defendant has the burden of showing government action.’).”
 

 United States v. Smith,
 
 210 F.Supp.2d 1096, 1102-03 (D.Neb.2001). A two-pronged test is used to determine whether a private citizen is acting as an agent for the police: (1) the police must have instigated, encouraged, or participated in the search; and (2) the individual must have engaged in the search with the intent of assisting the police in their investigation.
 
 Ex parte Hilley,
 
 484 So.2d 485, 490 (Ala. 1985).
 

 There is little evidence in the record concerning the seizure of the items from the garbage bag because Hyde did not object when they were introduced and admitted at trial. However, the record does show that Investigator Cole went to Jerry Griffis’s trailer after he saw a young girl riding a red bicycle. He spoke with Jerry Griffis. Griffis told Investigator Cole that Hyde had been riding the red bicycle to town for about four or five days to look for a job. Investigator Cole asked him where Hyde was. Griffis told him that Hyde had telephoned someone, that they had picked him up in a car, and that he had left the trailer. Cole asked Griffis to look around the trailer and call him if he found anything.
 

 Griffis testified that he remembered that when Hyde came back to the trailer on the day of the murders he went to the back porch. The back porch was where they put their garbage until someone could take it to a nearby dumpster. He looked through a couple of the bags, Griffis said, that were on the porch. In one bag he found a pistol, two wallets, and a set of keys. He called Hyde’s stepfather, who was his brother, Horace Griffis. Jerry Griffis said: “I told him I found a gun and wallets and keys in the garbage bag. I asked him what did he think I should do, and [Horace] said I think you ought to call the police right now.” (R. 993.) The record does not show Griffis’s motivation for calling the police other than the fact that his brother told him to call the police. Nothing in the scant record suggests that
 
 *1018
 
 Jerry Griffis was acting as an agent for the police.
 

 Moreover, Hyde had no legitimate expectation of privacy in a garbage bag he had placed on the back porch of the trailer. In
 
 California v. Greenwood,
 
 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988), the United States Supreme Court held that there is no legitimate expectation of privacy in garbage placed outside the house for trash collection. The majority of courts that have considered this issue since
 
 California v. Greenwood
 
 have held that the primary focus is not on whether the area where the garbage was located is within the curtilage of the house but whether there is a reasonable expectation of privacy-
 

 “Courts considering this issue after
 
 Greenwood
 
 have overwhelmingly held that whether the garbage is located within the home’s curtilage is not the determining factor. As one court noted, ‘[w]hether the officers violated the Fourth Amendment does not depend solely on curtilage.’
 
 United States v. Long,
 
 176 F.3d 1304, 1308 (10th Cir. 1999). In
 
 Long,
 
 the garbage seized was on top of a trailer with a camper shell between the garage and the alley. Atop the trailer was the regular location where Long placed his garbage for pickup. The court held the trailer was located outside the curtilage of the residence.
 
 Id.
 
 Further, the court concluded, even if the trash bags were within the curti-lage of the residence, they were readily accessible and visible from a public thoroughfare, thus defeating Long’s Fourth Amendment claim.
 
 Id.
 
 at 1309.
 

 “In
 
 United States v. Hedrick,
 
 922 F.2d 396 (7th Cir.1991), Hedrick’s garbage was located halfway up the driveway of his home, somewhat nearer the sidewalk than the garage. The court concluded that Hedrick’s garbage was located within the curtilage of his home.
 
 Id.
 
 at 400. However, the inquiry did not stop there. The court held that the ‘proper focus under
 
 Greenwood
 
 is whether the garbage was readily accessible to the public so as to render any expectation of privacy objectively unreasonable.’
 
 Id.
 
 at 400. ‘Garbage placed where it is not only accessible to the public but likely to be viewed by the public is “knowingly exposed” to the public for Fourth Amendment purposes.’
 
 Id.
 
 The court concluded that ‘[b]ecause the distance between the garbage cans and the public sidewalk was relatively short, the garbage was collected by the garbage service from that location, and the garbage cans were clearly visible from the sidewalk, we hold that Hedrick possessed no reasonable expectation of privacy in the garbage.’
 
 Id.
 
 at 400;
 
 see also United States v. Shanks,
 
 97 F.3d 977, 980 (7th Cir.1996) (warrantless search of garbage bags accessible and visible from the alley upheld);
 
 United States v. Wilkinson,
 
 926 F.2d 22, 27 (1st Cir.1991),
 
 overruled on other grounds
 
 by
 
 Bailey v. United States,
 
 516 U.S. 137, 116 S.Ct. 501, 509, 133 L.Ed.2d 472 (1995) (warrantless search of trash bags placed on the homeowner’s lawn next to the curb upheld);
 
 United States v. Trice,
 
 864 F.2d 1421, 1424 (8th Cir.1988) (warrantless search of garbage bags placed within the curtilage of the property but accessible to the public upheld).
 

 “The only Texas case reported with similar facts addressing this issue is
 
 Levario v. State,
 
 964 S.W.2d 290, 296 (Tex. App.-El Paso 1997, no pet.). In
 
 Levarlo,
 
 the seized garbage bags were located within the home’s curtilage, and they were also located in the normal place for collection. However, in
 
 Levarlo,
 
 unlike our facts, the garbage collectors, not the police, collected the garbage bags as usual and then turned them over to the
 
 *1019
 
 police. The El Paso court of appeals concluded Levario had no reasonable expectation of privacy in discarded trash even if it were within the curtilage of his home.
 
 Id. Levario
 
 is in line with the post
 
 -Greenwood
 
 federal cases cited above. Therefore, we agree with the El Paso court of appeals that once a person places his trash in the location for pickup by the trash collectors, where it is accessible to the public and likely to be viewed by the public, that person no longer has an objectively reasonable expectation of privacy in the trash. Further, it makes no difference whether the police or the garbage collector retrieves the bags. Once a person places trash bags containing contraband next to a public thoroughfare for collection, he exposes them to the public-at-large, including the police.
 
 See Shanks,
 
 97 F.3d at 980.”
 

 Nilson v. State,
 
 106 S.W.3d 869, 873-74 (Tex.App.Dallas 2003).
 

 “Other jurisdictions have upheld the warrantless search of garbage even though the trash was deposited in close proximity to defendant’s residence.
 
 See, e.g., U.S. v. Redmon,
 
 138 F.3d 1109 (7th Cir.1998),
 
 cert. denied
 
 525 U.S. 1066, 119 S.Ct. 794, 142 L.Ed.2d 657 (1999) (holding that defendant did not have a reasonable expectation of privacy in his garbage placed in front of the joint garage on the shared driveway-sidewalk to his townhouse);
 
 U.S. v. Hedrick,
 
 922 F.2d 396 (7th Cir.),
 
 cert. denied
 
 502 U.S. 847, 112 S.Ct. 147, 116 L.Ed.2d 113 (1991) (holding that defendant had no reasonable expectation of privacy in his garbage where the distance between the garbage cans on defendant’s driveway and the sidewalk was 18 feet, the garbage was collected by the garbage service at that location, and the garbage cans were clearly visible from the sidewalk);
 
 U.S. v. Shelby,
 
 573 F.2d 971 (7th Cir.),
 
 cert. denied
 
 439 U.S. 841, 99 S.Ct. 132, 58 L.Ed.2d 139 (1978) (holding that search of defendant’s garbage, located inside a low fence, by a trash collector at the FBI’s request did not violate the defendant’s reasonable expectation of privacy);
 
 People v. McNeal,
 
 175 Ill.2d 335, 222 Ill.Dec. 307, 677 N.E.2d 841,
 
 cert. denied
 
 522 U.S. 917, 118 S.Ct. 304, 139 L.Ed.2d 235 (1997) (holding exigent circumstances justified warrantless search of garbage cans leaning against the back of defendant’s townhouse, near the back door);
 
 State v. Trahan,
 
 229 Neb. 683, 428 N.W.2d 619,
 
 cert. denied
 
 488 U.S. 995, 109 S.Ct. 561, 102 L.Ed.2d 586 (1988) (holding that defendant lacked constitutionally protected expectation of privacy in trash located approximately 4 feet from the back door of his trailer);
 
 Levario v. State,
 
 964 S.W.2d 290 (Tex.App.1997) (holding that defendant lacked reasonable expectation of privacy in garbage located within a few feet of his home);
 
 cf. U.S. v. Certain Real Property Loc. at 987 Fisher Road,
 
 719 F.Supp. 1396, 1407 (E.D.Mich.1989) (holding that defendant had reasonable expectation of privacy in his garbage bags that were placed against the back wall of his house and hidden from the view of individuals passing in front of his house). See generally Annot.,
 
 Searches and Seizures: Reasonable Expectation of Privacy in Contents of Garbage or Trash Receptacle,
 
 62 A.L.R.5th 1, 20-21.”
 

 State v. Fortune,
 
 28 Kan.App.2d 559, 566-67, 20 P.3d 74, 79 (2001).
 

 Angela Griffis testified that the garbage was routinely placed on the back porch and that every day someone would take the garbage to a nearby dumpster. She said that, if they did not remove it from the porch every day, animals would get into the garbage. The trailer was in a
 
 *1020
 
 trailer park with approximately 12 other trailers. The back area of the trailer was open and visible to those passing by the trailer. Accordingly, even if Jerry Griffis was an agent of the police, which we do not hold, the search and seizure did not violate the Fourth Amendment protections because Hyde had no reasonable expectation of privacy in the garbage bag he had discarded on the back porch of a trailer he shared with other individuals.
 

 VIII.
 

 Hyde next argues that his convictions are due to be reversed if this Court finds that he did not receive effective assistance of counsel at trial. Hyde’s entire argument consists of the following two paragraphs in his brief:
 

 “A defendant has a constitutional right to ‘effective assistance of counsel.’
 
 See Strickland v. Washington,
 
 466 U.S. 668 (1984).
 
 See also Wiggins v. Smith,
 
 539 U.S. 510 (2003). When a defendant claims he did not receive effective assistance of counsel, the inquiry is whether ‘counsel’s challenged conduct’ was, ‘in light of all the circumstances ... outside the wide range of professionally competent assistance.’
 
 Strickland,
 
 466 U.S. at 690. The appropriate standards of review are set forth in
 
 Strickland
 
 and
 
 Wiggins. See generally
 
 466 U.S. 668, 539 U.S. 510.
 

 “Because your undersigned counsel represented Mr. Hyde at trial, and are thus solely and directly responsible for any conduct that could be challenged as ‘ineffective,’ your undersigned counsel are unable to objectively evaluate this assignment of error. In light of the seriousness of the issue involved, this Court should review the entire record in this case to determine whether Mr. Hyde received adequate assistance of counsel at trial, as set forth under
 
 Strickland v. Washington,
 
 466 U.S. 668 (1984), and
 
 Wiggins v. Smith,
 
 539 U.S. 510 (2003). If Mr. Hyde did not receive adequate assistance of counsel, this Court should reverse this case and remand it for a new trial on the merits.”
 
 [8]
 

 (Hyde’s appellate brief at pp. 72-73.)
 

 In this case, counsel never argued in the circuit court that Hyde was denied the effective assistance of counsel. Thus, this claim was never developed on the record.
 

 “Claims of ineffective assistance can rarely be determined from the trial record alone. An attorney’s actions are presumed competent.
 
 Risher v. State,
 
 523 P.2d 421, 424 (Alaska 1974);
 
 State v. Jones,
 
 759 P.2d 558, 567-570 (Alaska App.1988). Moreover, an attorney’s trial decisions — including which potential defenses to pursue, whether to object to the evidence offered by the government, how to cross-examine government witnesses, and whether and how to present a defense case — generally rest on considerations of strategy and trial tactics that are not directly addressed in open court.”
 

 Sharp v. State,
 
 837 P.2d 718, 722 (Alaska Ct.App.1992).
 
 [9]
 

 
 *1021
 
 To prevail on a claim of ineffective assistance of counsel the petitioner must show (1) that counsel’s performance was deficient, and (2) that he was prejudiced by the deficient performance. See
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Rarely has the United States Supreme Court applied a “presumed prejudice” standard to claims of ineffective assistance of counsel. In
 
 United States v. Cronic,
 
 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), a case released the same day as
 
 Strickland v. Washington,
 
 the Supreme Court stated:
 

 “There are, however, circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.
 

 “Most obvious, of course, is the complete denial of counsel. The presumption that counsel’s assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial. Similarly, if counsel entirely fails to subject the prosecution’s case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable. No specific showing of prejudice was required in
 
 Davis v. Alaska,
 
 415 U.S. 308 (1974), because the petitioner had been ‘denied the right of effective cross-examination’ which ‘ “would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.” ’
 
 Id.,
 
 at 318 (citing
 
 Smith v. Illinois,
 
 390 U.S. 129 (1968), and
 
 Brookhart v. Janis,
 
 384 U.S. 1, 3 (1966)).”
 

 466 U.S. at 659, 104 S.Ct. 2039 (footnotes omitted).
 

 Here, we cannot say that counsel’s performance was ineffective based on the record. Counsel was present at all stages of the trial, zealously cross-examined State witnesses, presented a defense, and presented several mitigation witnesses to testify at the penalty phase.
 
 [10]
 
 Based on the record before us, which contains no explanations from counsel as to why he proceeded in the penalty phase as he did, we cannot say that Hyde was denied the effective assistance of counsel.
 

 “ ‘An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of effective representation], Therefore “where the record is incomplete or unclear about [counsel]’s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.” ’
 
 Chandler v. United States,
 
 218 F.3d 1305, 1314 n. 15 (11th Cir.2000) (en banc) (quoting
 
 Williams v. Head,
 
 185 F.3d 1223, 1228 (11th Cir. 1999)).”
 

 Grayson v. Thompson,
 
 257 F.3d 1194, 1218 (11th Cir.2001). See
 
 Washington v. State,
 
 [Ms. CR-05-1297, January 12, 2007] — So.3d - (Ala.Crim.App.2007) (counsel not held to have rendered ineffective assistance at penalty phase of capital trial based on undeveloped record).
 

 IX.
 

 Hyde next argues that the cumulative effect of the errors warrants that he be given a new trial. “ ‘Because we find no error in the specific instances alleged by the appellant, we find no cumulative error.’
 
 *1022
 

 Lane v. State,
 
 673 So.2d 825 (Ala.Crim. App.1995). See also
 
 McGriff v. State,
 
 908 So.2d 961 (Ala.Crim.App.2000).”
 
 Calhoun v. State,
 
 932 So.2d 923, 974 (Ala.Crim.App. 2005). We likewise find no cumulative error in this case.
 

 Penalty-Phase Issues X.
 

 X.
 

 As required by § 13A-5-53, Ala.Code 1975, we must address the propriety of Hyde’s capital-murder convictions and sentence of death. Hyde was indicted and convicted of two counts of murdering Ran-dle Lane and Ricky Peterson during the course of a robbery and for murdering June Williams, Lane, and Peterson pursuant to one act or scheme or course of conduct, offenses defined as capital by § 13A-6-40(a)(2), Ala.Code 1975, and § 13A~5-40(a)(10), Ala.Code 1975. Both offenses are punishable by death.
 

 Section 13A-5-53(b), Ala.Code 1975, states:
 

 “In determining whether death was the proper sentence in the case the Alabama Court of Criminal Appeals ... shall determine:
 

 “(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
 

 “(2) Whether an independent weighing of the aggravating and mitigating circumstances at the appellate level indicates that death was the proper sentence; and
 

 “(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.”
 

 Section 13A-5-5S (b)(1)
 

 We have reviewed the record for any evidence that Hyde’s death sentence was imposed under the influence of passion,
 

 Section 13A-5-53 (b)(2)
 

 The circuit court found as aggravating circumstances that the victims were murdered during the course of robbing Lane and Peterson, § 13A-5-49(4), Ala. Code 1975, and that the victims were murdered by “by one act or pursuant to one scheme or course of conduct,” § 13A-5-49(9), Ala.Code 1975.
 

 The circuit court found no statutory mitigating circumstances. Hyde argues that the circuit court erred in not applying the statutory mitigating circumstance set out in § 13A-5-51(l> — that Hyde had no significant history of prior criminal activity. He asserts that the court based its finding on the fact that Hyde pleaded guilty in the State of Florida to attempted murder, robbery, and grand theft. Hyde argues that those charges arose out of one instance and that one prior conviction is not sufficient to constitute a “significant history of prior criminal activity” to negate this mitigating circumstance.
 

 The circuit court stated the following:
 

 “The State proved beyond a reasonable doubt that Christopher Shane Hyde pleaded guilty to attempted murder in the first degree, robbery with a weapon, and grand theft in the third degree on January 12, 1994, in case number 93010251CF10A, Broward County, Florida. Therefore, the defendant does have significant history of prior criminal activity.”
 

 (C.R. 286.) In
 
 Belisle v. State,
 
 11 So.3d 256, 319 (Ala.Crim.App.2007), we held that a 10-year-old burglary conviction was sufficient to negate the application of § 13A-5-51(1), Ala.Code 1975. We stated:
 

 “We held in
 
 Clisby v. State,
 
 456 So.2d 102 (Ala.Crim.App.1983), that a prior
 
 *1023
 
 conviction for first-degree burglary was sufficient to negate the mitigating circumstance of ‘no significant history of prior criminal activity.’ See also
 
 Stallworth v. State,
 
 868 So.2d 1128 (Ala.Crim. App.2001) (assault in the third degree can negate this mitigating circumstance).”
 

 11 So.3d at 319 (footnote omitted).
 

 Here, the record contains the certified copies of Hyde’s convictions in the State of Florida for attempted murder in the first degree, armed robbery with a deadly weapon, and grand theft in the third degree. He was sentenced to concurrent terms of 17 years for the attempted murder conviction and the armed robbery conviction and to 5 years on the grand theft conviction. Hyde has three prior convictions. The circuit court correctly determined that this mitigating circumstance was not present. See
 
 Belisle.
 

 Hyde also argues that the court erred in not finding his age at the time of the murders to be a mitigating circumstance. The circuit court stated the following concerning this circumstance:
 

 “Christopher Shane Hyde was born on December 30, 1972. At the time of the commission of the crimes herein, the defendant was thirty (30) years old. The age of the defendant at the time of the commission of the crime herein is not a mitigating circumstance.”
 

 (C.R. 287.) Hyde never argued that his age was a mitigating circumstance. Indeed, the record does not support that conclusion. Hyde’s full-scale IQ was 89, and he had a history of criminal activity. The circuit court did not err in declining to find Hyde’s age as a statutory mitigating circumstance. We have affirmed a court’s failure to apply this statutory mitigating circumstance in the following cases:
 
 Ziegler v. State,
 
 886 So.2d 127 (Ala.Crim.App. 2003) (defendant 24 years of age at the time of the murder);
 
 Hall v. State,
 
 820 So.2d 113 (Ala.Crim.App.1999) (defendant 21 years of age at the time of the murder);
 
 Ingram v. State,
 
 779 So.2d 1225 (Ala.Crim. App.1999) (defendant 22 years of age at the time of the murder).
 

 The circuit court found the following nonstatutory mitigating circumstances:
 

 “The defendant offered Julie Burgess who taught the defendant while he was at the Chalkville campus of the Department of Youth Services. Mrs. Burgess indicated that she believed the defendant was a product of his lack of suitable raising and deserved leniency. The defendant also offered Jo Ann Terrell who is an instructor in social work at the University of Alabama in Tuscaloosa. Mrs. Terrell also believes that the defendant is a product of his lack of suitable raising and believes the defendant possibly has some brain damage that may have occurred when he was young and would bang his head against concrete floors and other hard objects. Mrs. Terrell believed the brain damage, if it exists, could account for some of the defendant’s behavior. Mrs. Terrell also believed the defendant deserved leniency. The defendant’s mother, Wanda Griffis, and his stepfather, Horace Grif-fis, testified that the defendant did bang his head on hard surfaces a lot when he was a small child. The defendant’s sister, Brandi Griffis and his mother testified that they would visit the defendant in prison if he were given life without parole.”
 

 (C.R. 287.) Hyde argues that the court erred in not considering other evidence presented as nonstatutory mitigating circumstances.
 

 The Alabama Supreme Court noted in
 
 Ex parte Ferguson,
 
 814 So.2d 970 (Ala. 2001):
 

 
 *1024
 

 “See Lockett v. Ohio,
 
 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978);
 
 Ex parte Hart,
 
 612 So.2d 536, 542 (Ala.1992)
 
 (‘Lockett
 
 does not require that all evidence offered as mitigating evidence be found to be mitigating.’),
 
 cert. denied,
 
 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993); and
 
 Ex parte Slaton,
 
 680 So.2d 909, 924 (Ala.1996) (‘ “While
 
 Lockett
 
 and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.” ’) (quoting
 
 Bankhead v. State,
 
 585 So.2d 97, 108 (Ala.Crim.App.1989),
 
 cert. denied,
 
 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997)).”
 

 Ex parte Ferguson,
 
 814 So.2d at 976.
 

 The circuit court’s sentencing order shows that it considered all the evidence that had been presented. It stated: “[A]f-ter consideration of all the matters that were presented to this Court, the testimony heard at trial and the sentencing hearing before this Court both in mitigation and by aggravating, taking into consideration all other matters that were proffered before this Court as herein above stated in this order .... ” (C.R. 287-88.) The circuit court acted within its discretion in declining to find other nonstatutory mitigating circumstances.
 

 Section 13A-5-53(b)(2), Ala.Code 1975, provides that this Court must independently weigh the aggravating circumstances and the mitigating circumstances to determine the propriety of Hyde’s death sentence. After independently weighing the circumstances, we are convinced that the death sentence was the appropriate sentence in this case.
 

 Section lSA-5-53(b)(3)
 

 Neither was Hyde’s death sentence disproportionate to sentences imposed in similar cases. The death sentence was imposed in the following cases:
 
 Ex parte Maples,
 
 758 So.2d 81 (Ala.1999) (murder of two or more people pursuant to one act);
 
 Robitaille v. State,
 
 971 So.2d 43 (Ala.Crim. App.2005) (murder of two or more people pursuant to one act);
 
 Harrison v. State,
 
 869 So.2d 509 (Ala.Crim.App.2002) (robbery/murder);
 
 Smith v. State,
 
 795 So.2d 788 (Ala.Crim.App.2000) (robbery/murder);
 
 Freeman v. State,
 
 776 So.2d 160 (Ala.Crim. App.1999) (murder of two or more people pursuant to one act);
 
 Melson v. State,
 
 775 So.2d 857 (Ala.Crim.App.1999) (murder of two or more people pursuant to one act);
 
 McWhorter v. State,
 
 781 So.2d 257 (Ala. Crim.App.1999) (robbery/murder);
 
 Gaddy v. State,
 
 698 So.2d 1100 (Ala.Crim.App. 1995) (robbery/murder).
 

 Last, according to § 13A-5-53(a), Ala. Code 1975, and Rule 45A, Ala.R.App.P., we have searched the record for any error that may have adversely affected Hyde’s substantial rights and have found none.
 

 Hyde’s capital-murder convictions and his sentence of death are due to be affirmed.
 

 AFFIRMED.
 

 BASCHAB, P.J., and SHAW, WISE, and WELCH, JJ., concur.
 

 [1]
 

 . The name of this victim is spelled "Randle Lane” in the indictment. However, in other sections of the record his name is spelled "Randall Lane.”
 

 [2]
 

 . This was brought out at the motion for a new trial hearing.
 

 [3]
 

 . To protect the anonymity of the jurors, we are using their initials.
 

 [4]
 

 . Two questionnaires were completed by each prospective juror. Pursuant to Rule 18.2(b), Ala.R.Crim.P., we requested that the clerk of Walker County forward those questionnaires to this Court, and we have reviewed those documents.
 

 [5]
 

 . B.M. was asked on her questionnaire to rate her agreement with certain statements. One statement was the following: "Law enforcement officers or agents may be
 
 called to testify
 
 in this case. Law enforcement officers or agents are not entitled to greater weight on the issue of credibility merely because they are law enforcement officers.” (Question 8.) B.M. stated that she disagreed with that statement.
 

 [6]
 

 . Some jurisdictions hold that a threat to prosecute a family member does not render a statement involuntary. See
 
 United States v. Stewart,
 
 353 F.Supp.2d 703, 706 (E.D.La. 2004) ("The petitioner's confession was therefore not involuntary by reason of his desire to extricate his wife from a possible good faith arrest.”);
 
 United States v. Westbrook,
 
 125 F.3d 996, 1006 (7th Cir.1997) ("Nor do we believe that the agent placed undue psychological coercion on Mr. Westbrook by suggesting that il would be to his wife’s benefit, rather than (or as well as) to his own benefit, to cooperate.”); and
 
 United States v. Glover,
 
 104 F.3d 1570, 1580 (10th Cir.1997) ("These types of personal psychological pressures do not amount to official coercion rendering a confession involuntary/').
 

 [7]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 

 [8]
 

 . In
 
 Wiggins v. Smith,
 
 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), the United States Supreme Court held that counsel was ineffective at the penalty phase of a capital trial for failing to discover and present mitigation evidence.
 

 [9]
 

 . At least one court has noted:
 

 "Our courts have expressed a general policy against entertaining ineffective-assistance-of-counsel claims on direct appeal because such claims involve allegations and evidence that lie outside the trial record.
 

 ... Other courts have expressed the same rationale for encouraging defendants to
 
 *1021
 
 raise ineffective assistance of counsel claims in post-conviction proceedings.”
 

 State v. Preciose,
 
 129 N.J. 451, 460, 609 A.2d 1280, 1285 (1992).
 

 [10]
 

 . At the penalty phase, Hyde presented the testimony of his mother, his stepfather, his sister, a former teacher, and a licensed social worker who had evaluated Hyde and performed IQ tests on Hyde.