KELLUM, Judge.
 
 [1]
 

 Brent E. Martin was indicted for three counts of capital murder. In case no. CC-06-364, Martin was charged with the murder of Darryl Carrillo during the course of a kidnapping in the first degree or an attempt thereof,
 
 see
 
 § 13A-5^40(a)(l), Ala. Code 1975; in case no. CC-06-365, Martin was charged with the murder of Johnnie Randolph III during the course of a kidnapping in the first degree or an attempt thereof,
 
 see
 
 § 13A-5-40(a)(l), Ala.Code 1975; and in case no. CC-06-671, Martin was charged with the murder of two or more persons, Darryl Carrillo and Johnnie Randolph III, by one act or pursuant to one scheme or course of conduct,
 
 see
 
 § 13A-5-40(a)(10), Ala.Code 1975. A jury found Martin guilty of all three charges and, by a vote of 10-2, recommended that Martin be sentenced to death. The trial court followed the jury’s recommendation and sentenced Martin to death.
 
 [2]
 

 Facts
 

 The evidence adduced at trial indicated the following. In 2001, Martin married Lakeisha Randolph. Randolph had a daughter, Nakayla, from a previous relationship. During their marriage, Martin and Randolph had a son, B.J. The marriage deteriorated and Randolph left Martin in the summer of 2005. Randolph and her two children moved in with her mother and her younger brother, Johnnie Randolph III (“Johnnie”), at her mother’s residence in Phenix City. During the first week in September 2005, Martin telephoned Randolph several times and went to her place of employment. During their numerous conversations, Martin demanded that Randolph return to him all jewelry he had purchased for her during their marriage. He also accused her of dating another man and threatened to kill her. Randolph told Martin that their marriage was over and that she was going to hire a divorce lawyer. On September 8, 2005, Martin telephoned Randolph and asked if
 
 *1054
 
 she had had a change of heart about the marriage; Randolph informed Martin that she had not changed her mind about ending the marriage and that she was going to see a divorce lawyer the following day. Martin then said: “[B]itch, you ain’t going to live to see tomorrow.” (R. 1450.)
 

 Later that same day, at approximately 4:15 p.m., Randolph, who was at a friend’s house, received a telephone call from Johnnie asking her to bring him $25 because he had a flat tire that needed to be repaired. Johnnie initially asked Randolph to bring the money to their mother’s residence but then telephoned her two additional times, changing the location of the meeting each time. As Randolph was driving to meet Johnnie, she saw her friend, Alicia Dixon. She stopped and spoke with Dixon, asking Dixon to pick up then six-year-old Nakayla from her after-school program — the same program Dixon’s five-year-old daughter, Amari, attended — and to take Nakayla to Randolph’s mother’s house. Dixon agreed.
 

 When Dixon arrived at Randolph’s mother’s house with Nakayla, she saw Johnnie’s automobile and blew the horn, but no one came outside; she then telephoned Randolph. Randolph assured Dixon that if Johnnie’s automobile was there, he was also still there, and she asked Dixon to take Nakayla inside the house. Dixon found the side door to the house unlocked, and she and Nakayla entered. As Dixon called for Johnnie, Martin entered the house behind her and pointed a gun at her and Nakayla. Dixon said that Martin appeared to be on drugs and that he asked her where Randolph was. Dixon responded that she did not know. Martin then ordered Dixon and Nakayla outside to an automobile parked nearby. When they got to the automobile, Dixon saw Johnnie sitting in the backseat with his hands bound; Johnnie’s friend, Darryl Carrillo, was seated in the front passenger seat, also with his hands bound. Joseph Ogletree was sitting in the driver’s seat.
 

 As Dixon and Nakayla were led out of the house and to the automobile, Amari, who was still in Dixon’s automobile, apparently saw what was happening and attempted to flee. However, Martin instructed Ogletree to drive up the street to where Amari was running. Martin told Dixon that if she did not get her daughter in the car, he would kill Amari. Dixon instructed Amari to get in the car and Amari did. After Dixon was in the car, she received a telephone call from Randolph on her cellular telephone. By that time, Randolph had become suspicious that something was wrong and had already telephoned the police. Martin took Dixon’s telephone away from her, told Randolph that he had hostages, and then hung up. Believing that Martin was holding the hostages at Randolph’s mother’s residence, the police surrounded the house and began attempting to negotiate for the release of the hostages. However, before he had left the house, Martin had programmed the telephone in the house to forward all incoming calls to his cellular telephone.
 

 Ogletree and Martin left the area with the hostages before the police arrived; a short time later they came back to the area and saw the police. Martin then telephoned Randolph and told her again that he was holding everyone close to her hostage and told her that he was going to kill all of them. During the next several hours, Ogletree and Martin held the hostages captive in the car and drove back and forth between Phenix City and Columbus, Georgia; at one point, they also drove to Tuskegee, where Martin grew up. During these several hours, Martin and Ogle-tree both ingested cocaine and Martin drank alcohol. Testimony indicated that Ogletree was a willing participant in the crimes for the most part, but that he did
 
 *1055
 
 ask Martin on more than one occasion to let the hostages go, pointing out that two of them were children.
 
 [3]
 
 Martin refused, stating that the hostages would testify against him if he let them go.
 

 Throughout the night, Martin made several telephone calls to various people, including Randolph; he bragged that he was going to kill several people that night and that he would be on the television show “America’s Most Wanted” by the following day. At one point, Martin told Randolph again that he was going to kill all of his hostages, and that he would then find and kill her, and then kill all of her family members. In addition, Martin repeatedly threatened to kill his hostages. Specifically, Martin told his hostages several times that they were going to die, and he asked them if they had anything to say before their deaths. Martin also asked his hostages to give him a reason not to kill them; however, when Dixon indicated that he should not kill her because she had two small children, he told Dixon that that was not a good enough reason for him not to kill her.
 

 At one point, while in Tuskegee, Ogle-tree drove to an isolated area, and Martin ordered Dixon and Carrillo out of the car. Martin then asked them if they had any last requests, and Dixon and Carrillo begged for their lives. Martin agreed to spare their lives at that point, and ordered them back into the car. However, sometime between 11:00 p.m. and midnight that night, Ogletree drove to a secluded area in Phenix City and stopped the car. At that point, Martin asked Johnnie and Carrillo if they had any last requests; both begged Martin not to kill them. Martin, however, ordered Johnnie and Carrillo to get out of the car and to walk off the side of the roadway. After instructing the two to kneel, Martin then shot both Johnnie and Carrillo in the back of their heads.
 

 Martin got back in the car, and Ogletree drove away from the area, headed toward Columbus, Georgia. Shortly after the execution of Johnnie and Carrillo, a police negotiator was able to get a telephone call through to Martin, at which point Martin told the negotiator that he had killed some of the hostages; Martin did not state how many people he had killed. It was at that point in the evening that the police first discovered that Martin was not inside the house on 20th Avenue, and they began searching for him; they also located the bodies of Johnnie and Carrillo. On their way to Columbus, Georgia, Martin told Dixon that he had decided to rape her, and he ordered Dixon to take off all of her clothes. Dixon removed her shoes and pants, but when she informed Martin that she was menstruating at the time, Martin changed his mind and told Dixon that he would not rape her.
 

 Once in Columbus, Georgia, Martin telephoned his cousin, Carla Branscomb; he told Branscomb that he had killed two people, that he had hostages, and that he “was all over the news.” (R. 1085.) Sometime after that telephone call, Ogle-tree stopped and Martin ordered Dixon to get out of the car. When Martin turned his head, Dixon, clad only in a shirt and underwear, seized the opportunity to escape and fled — leaving the two children in the car. When Martin again telephoned his cousin in Columbus, Georgia, she begged him not to kill his hostages. Martin also again telephoned Randolph; he told her that he was going to kill Nakayla before he would allow Nakayla to speak with Randolph.
 

 Eventually, the car Ogletree was driving ran out of gas on Macon Road in Colum
 
 *1056
 
 bus, Georgia. Martin spoke with Bran-scomb’s daughter, Courtney McDonald, and asked her to bring him some gas. McDonald agreed to bring gas to Martin, but only if Martin would agree to give up the hostages. At that point, Martin informed McDonald that Dixon had escaped and that he had only the two children with him. McDonald agreed to bring Martin gas if he would give her the children in return; Martin agreed. McDonald, Bran-scomb, and Branscomb’s son, George McDonald (“George”) then left to meet Martin. However, when they arrived, instead of giving them the children, Martin got into Branscomb’s car with the two children and said, “[LJet’s go.” (R. 1092.) Not knowing what else to do, Branscomb began driving. Per Martin’s direction, she stopped at a gasoline station so that Martin could purchase cigarettes. Branscomb then drove to her house. McDonald and George both testified that Martin was not acting normally that night, and that he appeared to be under the influence of drugs and/or alcohol.
 

 When they arrived at the house, Bran-scomb asked Martin to give her the children; Martin willingly surrendered Amari, but refused to let Nakayla go. Branscomb sent Amari inside the house with McDonald. Martin stood outside on the front porch with Nakayla, while Branscomb and George attempted to persuade him to let Nakayla go. Martin refused, so Bran-scomb and George eventually gave up, went inside the house, and began speaking with McDonald about a way to get Nakay-la away from Martin.
 

 By this time, the police had tracked Martin to Branscomb’s house, and Columbus, Georgia, police officers surrounded the house. As four officers approached the front porch where Martin was standing, Martin fired two shots at them and then fled. As soon as the shots were fired, George opened the front door, grabbed Nakayla, and brought her into the house for safety. Martin was apprehended by additional officers as he tried to flee.
 

 The State presented evidence indicating that the bullet used to kill Johnnie was fired from the gun that was in Martin’s possession at the time of his arrest. The bullet removed from Carrillo was too badly damaged to determine whether it had been fired specifically from Martin’s gun, but testimony indicated that the caliber of bullet was the same as the caliber of Martin’s gun. In addition, a footprint found near the bodies of Johnnie and Carrillo matched the shoes Martin was wearing when he was apprehended.
 

 Standard of Review
 

 On appeal, Martin raises two issues, neither of which are properly preserved for appellate review. Therefore, we review both issues under the plain-error rule, Rule 45A, Ala. R.App. P., which provides:
 

 “In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or
 
 not
 
 brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
 

 As this Court stated in
 
 Hall v. State,
 
 820 So.2d 113 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001):
 

 “The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in
 
 United States v. Young,
 
 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies
 
 *1057
 
 only if the error is ‘particularly egregious’ and if it ‘seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.’
 
 See Ex parte Price,
 
 725 So.2d 1068 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999);
 
 Burgess v. State,
 
 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999);
 
 Johnson v. State,
 
 620 So.2d 679, 701 (Ala.Cr.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).”
 

 820 So.2d at 121-22.
 

 I.
 

 Martin contends that the trial court erred in denying his
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), motion because, he says, the State used its peremptory strikes in a discriminatory manner. Specifically, Martin challenges on appeal the State’s strike of one prospective juror, B.B., an African-American female, on the ground that the State’s reasons for striking that juror were pre-textual.
 

 The record reflects that the venire initially consisted of 90 prospective jurors. After the trial court excused several prospective jurors for various reasons and granted several challenges for cause by the parties, 48 prospective jurors remained, of which 14 were African-American and 34 were white. Each party was allotted 18 peremptory strikes, "with each parties’ last strike being an alternate juror. The State used 11 of its strikes to remove prospective African-American jurors and 7 to remove prospective white jurors. The defense used all of its strikes to remove prospective white jurors. Martin’s jury consisted of 3 African-American jurors and 9 white jurors; both alternate jurors were white. Before the parties began striking the jury, the trial court instructed the attorneys to state their reasons for each strike at the time of the strike. In striking juror B.B., the prosecutor stated:
 

 “In questioning, she indicated she had a nephew that had been convicted of rape and when I asked her did she think he had been fairly treated, she was extremely hesitant in answering that question. She also indicated that she knew information about this case from the media. On her questionnaire, she failed to answer the two questions that specifically went to whether or not you would impose the death penalty. She indicated that she then didn’t know about the death penalty. Finally, she said she thought maybe she could. Additionally, she didn’t fill out other questions, I believe, on the questionnaire, and last but not least, she directly works for L.S., who I recently prosecuted for failing to disclose certain information required by law by working at Russell Elementary.”
 

 (R. 946.) After the jury was struck, but before it was sworn, the following occurred:
 

 “[Martin’s counsel]: Judge, yes, there is a challenge to the jury as selected.
 

 “THE COURT: And what’s the challenge based upon?
 

 “[Martin’s counsel]: The racial composition, Judge. There are 14 jurors, 12 jurors and two alternates. According to my tally, there are 11 whites and three blacks on this jury. Of the whites, there are five white females and six white males. There are no black males on this jury and there are three black females, and we certainly don’t believe that this reflects the racial composition of this county and would object to this jury being impaneled.
 

 
 *1058
 
 “THE COURT: Anything further other than that?
 

 “[Prosecutor]: Judge, in response, I point out that out of 18 strikes, the Defendant did not strike any African-Americans. They were all white males. The State’s strikes went both white males, black males, black females and white females, and we feel we have given racially neutral reasons for each and every one of those strikes and the Court heard those as we gave them.
 

 “THE COURT: The Court accepts the basis for the strikes given by the State and, also, the Court does not feel like the
 
 Batson
 
 motion has been pleaded with specificity to show racial discrimination in the prosecution’s selection of the jury nor a history of selection by race in the past and would deny the motion at this time.”
 

 (R. 964-65.) Martin never presented to the trial court the argument he now makes on appeal regarding the State’s reasons for striking prospective juror B.B.; therefore, we review this claim for plain error.
 

 “The party alleging discriminatory use of a peremptory strike bears the burden of establishing a prima facie case of discrimination.”
 
 Ex parte Brooks,
 
 695 So.2d 184, 190 (Ala.1997). However,
 

 “where, as in the present case, the trial court does not make an express finding that a prima facie case of discrimination has been established but nonetheless requires the challenged party to explain its peremptory strikes, the appellate court will presume that the trial court found a prima facie case and will evaluate the explanations offered by the challenged party.”
 

 Rogers v. State,
 
 819 So.2d 643, 648 (Ala.Crim.App.2001).
 
 See also Ex parte Brooks,
 
 695 So.2d at 190;
 
 Huntley v. State,
 
 627 So.2d 1013 (Ala.1992); and
 
 Johnson v. State,
 
 43 So.3d 7, 11 (Ala.Crim. App.2009). Here, the trial court did not make an express finding that Martin had established a prima facie case of racial discrimination. Rather, before the striking of the jury even began, the trial court instructed both parties to state the reasons for each strike as the strikes were made. Therefore, we have no choice but to presume that a prima facie case of discrimination was established, and we will evaluate the prosecutor’s reasons for striking B.B.
 

 “After a prima facie case is established, there is a presumption that the peremptory challenges were used to discriminate against black jurors.
 
 Batson,
 
 476 U.S. at 97, 106 S.Ct. at 1723. The state then has the burden of articulating a clear, specific, and legitimate reason for the challenge which relates
 
 to the particular case to be tried,
 
 and which is nondiscriminatory.
 
 Batson,
 
 476 U.S. at 97, 106 S.Ct. at 1723. However, this showing need not rise to the level of a challenge for cause.
 
 [Ex parte
 
 ]
 
 Jackson,
 
 [516 So.2d 768 (Ala.1986) ].”
 

 Ex parte Branch,
 
 526 So.2d 609, 623 (Ala.1987).
 

 “Within the context of
 
 Batson,
 
 a ‘race-neutral’ explanation ‘means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the
 
 facial validity
 
 of the prosecutor’s explanation. Unless a discriminatory intent is inherent
 
 in
 
 the prosecutor’s explanation, the reason offered will be deemed race neutral.’
 
 Hernandez v. New York,
 
 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). ‘In evaluating the race-neutrality of an attorney’s explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law.’
 
 Id.
 
 ‘[Evaluation of the prosecutor’s state of mind
 
 *1059
 
 based on demeanor and credibility lies “peculiarly within the trial judges’s province.” ’
 
 Hernandez,
 
 500 U.S. at 365, 111 S.Ct. at 1869.”
 

 Allen v. State,
 
 659 So.2d 135, 147 (Ala.Crim.App.1994) (emphasis added).
 
 See also Rogers,
 
 819 So.2d at 649. “ ‘The trial court is in a better position than the appellate court to distinguish bona fide reasons from sham excuses.’ ”
 
 Harris v. State,
 
 2 So.3d 880, 899 (Ala.Crim.App.2007) (quoting
 
 Heard v. State,
 
 584 So.2d 556, 561 (Ala.Crim.App.1991)). Thus, ‘““[o]n appeal, the trial court’s ruling on the question whether the responding party offered legitimate race-neutral reasons will not be overturned unless it is clearly erroneous.” ’ ”
 
 Harris,
 
 2 So.3d at 899 (quoting
 
 Harrison v. State,
 
 879 So.2d 594, 607 (Ala.Crim.App.2003) (quoting in turn
 
 Ex parte Brooks,
 
 695 So.2d at 190)). “ ‘ “A finding is ‘clearly erroneous’ when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.” ’ ”
 
 Fletcher v. State,
 
 703 So.2d 432, 436 (Ala.Crim.App.1997) (quoting
 
 Davis v. State,
 
 555 So.2d 309, 312 (Ala.Crim.App.1989) (quoting in turn
 
 Powell v. State,
 
 548 So.2d 590, 594 (Ala.Crim.App.1988), aff'd, 548 So.2d 605 (Ala.1989))).
 

 “Once the prosecutor has articulated a nondiscriminatory reason for challenging the black jurors, the other side can offer evidence showing that the reasons or explanations are merely a sham or pretext.
 
 [People v.] Wheeler,
 
 22 Cal.3d [258] at 282, 583 P.2d [748] at 763-64, 148 CaL.Rptr. [890] at 906 [(1978)]. Other than reasons that are obviously contrived, the following are illustrative of the types of evidence that can be used to show sham or pretext:
 

 “1. The reasons given are not related to the facts of the case.
 

 “2. There was a lack of questioning to the challenged juror, or a lack of meaningful questions.
 

 “3. Disparate treatment — persons with the same or similar characteristics as the challenged juror were not struck....
 

 “4. Disparate examination of members of the venire; e.g., a question designed to provoke a certain response that is likely to disqualify the juror was asked to black jurors, but not to white jurors....
 

 “5. The prosecutor, having 6 peremptory challenges, used 2 to remove the only 2 blacks remaining on the venire....
 

 “6. ‘An explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically.’
 
 Slappy [v. State],
 
 503 So.2d [350] at 355 [ (Fla.Dist.Ct.App.1987) ]. For instance, an assumption that teachers as a class are too liberal, without any specific questions having been directed to the panel or the individual juror showing the potentially liberal nature of the challenged juror.”
 

 Ex parte Branch,
 
 526 So.2d at 624.
 

 In the instant case, the prosecutor provided five reasons for striking prospective juror B.B. Martin challenges on appeal only three of those reasons — the first three asserted by the prosecutor. Martin makes no argument, nor does he even mention in his brief, the final two reasons asserted by the prosecutor for striking B.B. It is well settled that “[a]s long as one reason given-by the prosecutor for the strike of a potential juror is sufficiently race-neutral, a determination concerning any other reason given need not be made.”
 
 Johnson v. State,
 
 648 So.2d 629, 632 (Ala.Crim.App.1994).
 
 See also Jackson v. State,
 
 791 So.2d 979, 1009 n. 6
 
 *1060
 
 (Ala.Crim.App.2000);
 
 Brown v. State,
 
 705 So.2d 871, 874 (Ala.Crim.App.1997); and
 
 Wood v. State,
 
 715 So.2d 812, 816 (Ala.Crim.App.1996), aff'd, 715 So.2d 819 (Ala.1998). “Where a prosecutor gives a reason which may be a pretext, ... but also gives valid additional grounds for the strike, the race-neutral reasons will support the strike.”
 
 Battle v. State,
 
 574 So.2d 943, 949 (Ala.Crim.App.1990). Even so, we have thoroughly reviewed the extensive individual voir dire of the venire-members — encompassing over 800 pages in the transcript — as well as the questionnaires filled out by the prospective jurors, and we conclude that all five reasons provided by the prosecutor for striking B.B. were race neutral and that none was pre-textual.
 

 The prosecutor’s first reason for striking B.B. was that she was hesitant in answering questions regarding whether her nephew had been treated fairly with respect to his conviction for rape. Hesitancy in answering questions during voir dire is a race-neutral reason for a peremptory strike.
 
 See, e.g., Morris v. State,
 
 246 Ga.App. 260, 540 S.E.2d 244 (2000), and
 
 State v. Weaver,
 
 912 S.W.2d 499 (Mo.1995) (both holding that hesitancy in answering questions is a race-neutral reason for striking a prospective juror). In addition, the fact that a prospective juror has a relative who has been convicted of a crime is a race-neutral reason for a peremptory strike.
 
 See,
 
 e.g.,
 
 Ex parte Brown,
 
 686 So.2d 409, 418 (Ala.1996);
 
 Ex parte McNair,
 
 653 So.2d 353, 356 (Ala.1994);
 
 Lee v. State,
 
 898 So.2d 790, 814 (Ala.Crim. App.2001); and
 
 Clark v. State,
 
 896 So.2d 584, 612 (Ala.Crim.App.2000).
 

 Martin argues, however, that this reason was pretextual because, he says, it is not supported by the record. The record reflects the following during voir dire of B.B.:
 

 “[Prosecutor]: Now, we have a copy of your questionnaire.
 

 “[B.B.]: Yes.
 

 “[Prosecutor]: And there are a couple of things I wanted to follow up. You indicated you had a nephew who was charged with rape in Atlanta?
 

 “[B.B.]: Yes, sir.
 

 “[Prosecutor]: And that was this year, 2007?
 

 “[B.B.]: Yes,
 
 sir.
 

 “[Prosecutor]: And he was found guilty and given — was he given a jail sentence, or what happened?
 

 “[B.B.]: Yes, sir.
 

 “[Prosecutor]: Do you feel like your nephew was treated fairly by the system?
 

 “[B.B.]: I really can’t say because I really don’t know the whole situation.
 

 “[Prosecutor]: I take it you didn’t attend the trial?
 

 “[B.B.]: No, sir.”
 

 (R. 621.)
 

 We agree with Martin that the record does not reflect hesitancy on the part of B.B. when answering questions about her nephew’s conviction. However, hesitancy in answering questions, like the demeanor of a prospective juror, will ofttimes not be reflected in the record. The fact that a prosecutor’s stated reason for striking a juror is not reflected in the record does not necessarily make that reason pretextual. Rather, once the prosecutor articulated this race-neutral reason for striking B.B., the burden was on Martin to show that the reason was pretextual. Martin did not object, or even disagree, when the prosecutor stated hesitancy in answering questions as a reason for striking B.B., nor did Martin make any argument to the trial court that this reason for striking B.B. was pretextual.
 
 See, e.g., Finney v. State,
 
 860
 
 *1061
 
 So.2d 367, 380 (Ala.Crim.App.2002) (prosecutor’s stated reason for striking juror was not pretextual although the juror’s nodding of her head and stating “yeah” in response to another juror’s opinion regarding confidential informants — one of the prosecutor’s reasons for striking the juror — was not reflected in the record, because the defendant did not object or otherwise disagree with the prosecutor’s assertion regarding the juror); and
 
 Rogers,
 
 819 So.2d at 650 (although demeanor of prospective juror was not reflected in record, the State’s proffered reason for striking the juror — that the juror was looking and laughing at the defendant during voir dire — was held to be race neutral and not pretextual where the defendant failed to object or disagree with prosecutor’s assertion that juror was looking at and laughing at the defendant). In addition, when denying Martin’s
 
 Batson
 
 motion, the trial court specifically stated that it accepted the State’s reasons for its strikes. Under these circumstances, we cannot find that this reason for striking B.B. was pretextual.
 

 The prosecutor’s second reason for striking B.B. was that she had heard about the case from the media. “‘[T]he fact that [a veniremember] may have gained information from pretrial publicity related to the facts of the case to be tried is a race-neutral reason for a strike.’”
 
 Blanton v. State,
 
 886 So.2d 850, 874 (Ala.Crim.App.2003) (quoting
 
 Sockwell v. State,
 
 675 So.2d 4, 20 (Ala.Crim.App.1993), aff'd, 675 So.2d 38 (Ala.1995)). Martin argues, however, that this reason was pretextual because, he says, two other prospective jurors, W.W. and J.H., both white males who were not struck by the State and who ultimately served on his jury, had also been exposed to media coverage and “would be more of a concern regarding media exposure than [jjuror B.B.” (Martin’s brief, at 22-23.)
 

 Martin argues that juror W.W. should have been more of a concern to the prosecutor than B.B. regarding media coverage because, according to Martin, W.W. stated only “I think so” when asked whether he could set aside anything he had heard about the case and base his decision solely on the evidence presented at trial, while B.B. stated “I can” when asked the same question. We disagree. “I think so” and “I can” are not so substantially dissimilar as to make W.W. more of a concern to the prosecutor than B.B. regarding media coverage.
 

 Martin further argues — in obvious contradiction to his first argument — that B.B.’s answers and W.W.’s answers regarding media coverage were “almost identical” and that “as to the issue of media exposure the
 
 only
 
 difference between [B.B. and juror W.W.] is their race.” (Martin’s brief, at 23.)
 

 We agree with Martin that the record reveals no discernable difference between B.B. and W.W. with respect to their answers regarding media coverage — both stated that they had heard about the case, but that they could not remember any specific facts; both stated that they had not formed any opinions about the case; and both essentially stated that they could set aside any knowledge they had from media coverage and base their decision solely on the evidence presented at trial. However, a prosecutor’s stated reason for striking a prospective juror cannot be viewed in a vacuum and without regard to any other reasons for striking that juror. Although B.B. and W.W. were similar with respect to their exposure to media coverage of the case, there were substantial differences between them in other respects. For example, B.B. expressed mixed feelings regarding the death penalty
 
 *1062
 

 (see
 
 discussion below), while W.W. indicated that he was strongly in favor of the death penalty; juror B.B. had a relative who had been convicted of a crime, while W.W. did not; and B.B. worked directly for a man who had been prosecuted by the very prosecutor who was prosecuting Martin, while W.W. did not. Therefore, we cannot say that the prosecutor’s not striking W.W. based on his media exposure indicates that the prosecutor’s striking of B.B. based in part on her media exposure was pretextual.
 

 Martin argues that juror J.H. should also have been more of a concern to the prosecutor than B.B. regarding media coverage because, according to Martin, J.H. had “constant” exposure to the media while B.B. did not. (Martin’s brief, at 23.) He also argues that there was disparate examination of B.B. and J.H. by the prosecutor because, he says, J.H. was never asked by the prosecutor whether he had formed an opinion about the case based on his media exposure while B.B. was asked that question. However, the entire premise underlying this argument — that J.H. had been exposed to media coverage of the case — is incorrect. The record reflects that when the prosecutor asked J.H. if he had heard anything about the case, J.H. responded: “No, sir.” (R. 880.) J.H. then added that “if’ there was something in the newspaper about the case, he had “probably” read it because he reads the newspaper “quite a bit.” (R. 880.) J.H., however, had no recollection of hearing or reading about the case. J.H. had also indicated on the juror questionnaire that he did not know whether he had heard anything about the case from the media. B.B., on the other hand, answered “Yes, sir” when asked whether she had heard about the case and also indicated on the questionnaire that she had heard about the case. (R. 622.) Although she could not remember any specifics about the case, B.B. did remember hearing about the case, unlike J.H., who did not even remember hearing about the case. Moreover, because J.H. had never heard about the case, the prosecutor had no reason to ask J.H. if he had formed any opinion about the case based on what he had heard. We find no racial disparity in the prosecutor’s questioning of the jurors that would indicate the prosecutor’s striking of B.B. based on her media exposure was pretextual.
 

 The prosecutor’s third reason for striking B.B. was that she did not answer two questions on the juror questionnaire regarding the death penalty, and she stated during voir dire that she did not answer the questions because she did not know how she felt about the death penalty at the time she filled out the questionnaire, but she eventually stated during voir dire that “she thought that maybe she could” impose the death penalty. “Mixed feelings or reservations regarding imposition of the death penalty are valid race-neutral reasons for peremptory strikes.... ”
 
 Acklin v. State,
 
 790 So.2d 975, 988 (Ala.Crim.App.2000).
 
 See also Mashburn v. State,
 
 7 So.3d 453 (Ala.Crim.App.2007), and
 
 Hocker v. State,
 
 840 So.2d 197 (Ala.Crim.App.2002). “Although a juror’s reservations about the death penalty may not be sufficient for a challenge for cause, his [or her] view may constitute a reasonable explanation for the exercise of a peremptory strike.”
 
 Johnson v. State,
 
 620 So.2d 679, 696 (Ala.Crim.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993). In addition, “lack of response by or participation of veniremembers is a valid race-neutral reason for striking a prospective juror.”
 
 Macon v. State,
 
 659 So.2d 221, 223 (Ala.Crim.App.1994).
 

 Martin argues that this reason was pre-textual because, he says, it is not supported by the record. Specifically, Martin
 
 *1063
 
 argues that B.B. did not state that “she thought that maybe she could” impose the death penalty, but clearly stated that she had no problems with the death penalty and could vote to impose it. During voir dire, the following occurred:
 

 “[Prosecutor]: ... Now, I notice there were some questions that asked you what’s your opinion about the death penalty and you didn’t answer that. What is your opinion?
 

 “[B.B.]: I didn’t answer it because I don’t know. I mean—
 

 “[Prosecutor]: Well, let me ask you, do you think the State should be able to seek the death penalty?
 

 “[B.B.]: Yes.
 

 “[Prosecutor]: Ma’am?
 

 “[B.BJ: Yes.
 

 “[Prosecutor]: And do you feel like it is an appropriate punishment in some cases?
 

 “[B.B.]: Yes.
 

 “[Prosecutor]: Let me kind of ask you the big question. Could you personally vote to impose or recommend the death penalty, because the jury’s verdict on life without parole or death is, in fact, a recommendation to the Court, but could you recommend the death penalty for someone?
 

 “[B.B.]: Yes.”
 

 (R. 623.) We must agree with Martin that the prosecutor’s recollection of B.B.’s answers during voir dire regarding her feelings about the death penalty was inaccurate. However, it is clear to us that it was not B.B.’s ultimate answers during voir dire regarding her feelings about the death penalty that concerned the prosecutor. Rather, it was her failure to answer the death-penalty questions on the questionnaire and her explanation that she did not answer the questions because she did not know what her feelings about the death penalty were at that time. The fact that the prosecutor’s recollection of B.B.’s exact answers during voir dire was inaccurate does not convince us that this reason for striking B.B. was pretextual.
 

 The prosecutor’s final two reasons for striking B.B. were that B.B. failed to answer several questions on the juror questionnaire and that B.B. worked directly for a man who had recently been prosecuted by the very prosecutor who was prosecuting Martin. Failure to answer questions on a juror questionnaire is a race-neutral reason for a peremptory strike. See, e.g.,
 
 Jones v. State,
 
 826 So.2d 901, 903 (Ala.Crim.App.2001), and
 
 Johnson v. State,
 
 648 So.2d 629, 631 (Ala.Crim.App.1994). In addition, the fact that a juror worked directly for someone who had recently been prosecuted by the district attorney’s office is a race-neutral reason for a peremptory strike. See, e.g.,
 
 Adkins v. State,
 
 639 So.2d 515, 518 (Ala.Crim.App.1993) (“A juror’s association with a known criminal is also a valid race-neutral reason for striking a prospective juror.”), aff'd, 639 So.2d 522 (Ala.1994). Moreover, we find, and Martin does not argue otherwise, that these reasons were not pretextual. Although there were other prospective jurors who failed to answer some questions on the juror questionnaire and who were not struck by the State, only one juror failed to answer as many questions on the questionnaire as B.B. failed to answer, juror W.W. As noted above, however, W.W. was strongly in favor in the death penalty, while B.B. was not. In addition, although some prospective jurors who were not struck by the State had relatives who had been convicted of crimes, no other jurors worked directly for a person who had been prosecuted very recently by the very prosecutor who was prosecuting Martin. Therefore, we find that these reasons for striking B.B. were not pretextual.
 

 
 *1064
 
 For the reasons stated above, we find that the trial court’s denial of Martin’s
 
 Batson
 
 motion was not clearly erroneous. Therefore, we find no error, plain or otherwise, as to this claim.
 

 II.
 

 Martin contends that his trial counsel were ineffective because, he says, they failed to conduct an adequate investigation into mitigating circumstances for the penalty phase of the trial. Martin argues that counsel’s detailed billing statements presented to the trial court and contained in the record, indicate that counsel spent a total of only six hours investigating mitigating circumstances. He also argues that the record reflects that counsel failed to request funds for a mitigation expert, a social worker, or a psychological expert to help prepare for the penalty phase of the trial. According to Martin, funds for a mitigation expert are “mandated” in order to provide effective assistance of counsel. (Martin’s brief, at 33.) Martin further argues that counsel presented only two witnesses during the penalty phase of the trial and introduced into evidence the psychiatric report prepared before trial by the State’s psychiatrist, but failed to obtain and present his school records or his mental-health records from when he was a child
 
 [4]
 
 or to address before the jury any specific information contained in the psychiatric report. Martin maintains that counsel’s investigation and presentation of evidence at the penalty phase of his trial was so lacking that it constituted per se deficient performance and that prejudice should be presumed based on the record. Martin did not raise this claim in the trial court; therefore, we review it for plain error. See Rule 45A, Ala. R.App. P.
 

 At the penalty-phase of the trial, defense counsel called two witnesses to testify on Martin’s behalf — Martin’s cousin, Carla Branscomb, and Martin’s brother, Brady. Their testimony indicated that Martin’s father left the family home when Martin was very young and passed away when Martin was 11 or 12 years old. Within two years of his father’s death, Martin’s mother passed away, leaving Martin and his five siblings, the oldest of whom was 20 years old at the time and took custody of the younger siblings, to fend for themselves. When Martin was 16 years old, his oldest sibling abandoned Martin and his remaining siblings. In addition, counsel introduced into evidence the psychiatric report prepared before trial. Although the purpose of the report was to determine Martin’s competency to stand trial and his mental state at the time of the offenses, the background in the report indicates that Martin began drinking alcohol and smoking marijuana at the age of 12. Some time later he started using cocaine. By the time of the offenses — when Martin was 32 years old — he was drinking a six-pack of beer and a pint of liquor on a daily basis. He was also smoking three to four marijuana cigarettes and ingesting one to two grams of cocaine daily.
 

 “ ‘In order to prevail on a claim of ineffective assistance of counsel, a defendant must meet the two-pronged test articulated by the United States Supreme Court in
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):
 

 “ ‘ “First, the defendant must show that counsel’s performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the
 
 *1065
 
 ‘counsel’ guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.”
 

 “ ‘466 U.S. at 687, 104 S.Ct. at 2064.
 

 “ ‘ “The performance component outlined in
 
 Strickland
 
 is an objective one: that is, whether counsel’s assistance, judged under ‘prevailing professional norms,’ was ‘reasonable considering all the circumstances.’ ”
 
 Daniels v. State,
 
 650 So.2d 544, 552 (Ala.Cr.App.1994), cert. denied, [514 U.S. 1024, 115 S.Ct. 1375, 131 L.Ed.2d 230 (1995) ], quoting
 
 Strickland,
 
 466 U.S. at 688, 104 S.Ct. at 2065. “A court deciding an actual ineffectiveness claim must judge the reasonableness of counsel’s challenged conduct on the facts of the particular case, viewed as of the time of counsel’s conduct.”
 
 Strickland,
 
 466 U.S. at 690, 104 S.Ct. at 2066.
 

 “ ‘The claimant alleging ineffective assistance of counsel has the burden of showing that counsel’s assistance was ineffective.
 
 Ex parte Baldwin,
 
 456 So.2d 129 (Ala.1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985). “Once a petitioner has identified the specific acts or omissions that he alleges were not the result of reasonable professional judgment on counsel’s part, the court must determine whether those acts or omissions fall ‘outside the wide range of professionally competent assistance.’
 
 [Strickland,]
 
 466 U.S. at 690, 104 S.Ct. at 2066.”
 
 Daniels,
 
 650 So.2d at 552. When reviewing a claim of ineffective assistance of counsel, this court indulges a strong presumption that counsel’s conduct was appropriate and reasonable.
 
 Hallford v. State,
 
 629 So.2d 6 (Ala.Cr.App.1992), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994);
 
 Luke v. State,
 
 484 So.2d 531 (Ala.Cr.App.1985). “This court must avoid using ‘hindsight’ to evaluate the performance of counsel. We must evaluate all the circumstances surrounding the case at the time of counsel’s actions before determining whether counsel rendered ineffective assistance.”
 
 Hallford,
 
 629 So.2d at 9. See also, e.g.,
 
 Cartwright v. State,
 
 645 So.2d 326 (Ala.Cr.App.1994).
 

 “ ‘ “Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, un
 
 *1066
 
 der the circumstances, the challenged action ‘might be considered sound trial strategy.’ There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.”
 

 “
 
 ‘Strickland,
 
 466 U.S. at 689, 104 S.Ct. at 2065 (citations omitted).
 
 See Ex parte Lawley,
 
 512 So.2d 1370, 1372 (Ala.1987).
 

 “ ‘ “Even if an attorney’s performance is determined to be deficient, the petitioner is not entitled to relief unless he establishes that ‘there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.’
 
 [Strick
 
 land,] 466 U.S. at 694, 104 S.Ct. at 2068.”
 

 “
 
 ‘Daniels,
 
 650 So.2d at 552.
 

 “ ‘ “When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer — including an appellate court, to the extent it independently reweighs the evidence — would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.”
 

 “‘Strickland,
 
 466 U.S. at 697, 104 S.Ct. at 2069, quoted in
 
 Thompson v. State,
 
 615 So.2d 129, 132 (Ala.Cr.App.1992), cert. denied, 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 418 (1993).
 

 [[Image here]]
 

 “Bui v. State,
 
 717 So.2d 6,12-13 (Ala.Cr.App.1997), cert. denied, 717 So.2d 6 (Ala.1998).”
 

 Dobyne v. State,
 
 805 So.2d 733, 742-44 (Ala.Crim.App.2000), aff'd, 805 So.2d 763 (Ala.2001).
 

 Although the United States Supreme Court has recognized that a showing of prejudice is not required to establish the ineffectiveness of counsel in circumstances “that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified,”
 
 United States v. Cronic,
 
 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), those circumstances are extremely rare and limited. See
 
 Hyde v. State,
 
 13 So.3d 997, 1021 (Ala.Crim.App.2007) (“Rarely has the United States Supreme Court applied a ‘presumed prejudice’ standard to claims of ineffective assistance of counsel.”). Indeed, they are limited solely to those “situations in which counsel has entirely failed to function as the client’s advocate.”
 
 Florida v. Nixon,
 
 543 U.S. 175, 189, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004). Here, counsel did not entirely fail to function as Martin’s advocates. Indeed, the record reflects that counsel conducted an investigation into mitigating circumstances, presented evidence at the penalty phase of the trial, and argued mitigating circumstances to the jury. The only question presented here is whether counsel’s investigation for the penalty phase of the trial was reasonable considering all the circumstances. Therefore, we decline to apply the “presumed prejudice” standard in this case.
 

 Initially, we note that there is an inherent difficulty in reviewing claims of ineffective assistance of trial counsel for the first time on direct appeal when those claims have not been raised in the trial court and fully developed on the record. “ ‘Claims of ineffective assistance of counsel can rarely be determined from the trial record alone.’”
 
 Hyde,
 
 13 So.3d at 1020 (quoting
 
 Sharp v. State,
 
 837 P.2d 718, 722 (Alaska
 
 *1067
 
 Ct.App.1992)). As the United States Supreme Court explained in
 
 Massaro v. United States,
 
 538 U.S. 500, 128 S.Ct. 1690, 155 L.Ed.2d 714 (2003):
 

 “When an ineffective-assistance claim is brought on direct appeal, appellate counsel and the court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose. Under
 
 Strickland v. Washington,
 
 466 U.S. 668 (1984), a defendant claiming ineffective counsel must show that counsel’s actions were not supported by a reasonable strategy and that the error was prejudicial. The evidence introduced at trial, however, will be devoted to issues of guilt or innocence, and the resulting record in many cases will not disclose the facts necessary to decide either prong of the
 
 Strickland
 
 analysis. If the alleged error is one of commission, the record may reflect the action taken by counsel but not the reasons for it. The appellate court may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive or was taken because the counsel’s alternatives were even worse. See
 
 Guinan
 
 [v.
 
 United States,
 
 6 F.3d 468,] 473 [ (7th Cir.1993) ] (Easter-brook, J., concurring) (‘No matter how odd or deficient trial counsel’s performance may seem, that lawyer may have had a reason for acting as he did.... Or it may turn out that counsel’s overall performance was sufficient despite a glaring omission ...’). The trial record may contain no evidence of alleged errors of omission, much less the reasons underlying them. And evidence of alleged conflicts of interest might be found only in attorney-client correspondence or other documents that, in the typical criminal trial, are not introduced. See,
 
 e.g., Billy-Eko
 
 [v.
 
 United States,
 
 8 F.3d 111,] 114 [ (2d Cir.1993) ]. Without additional factual development, moreover, an appellate court may not be able to ascertain whether the alleged error was prejudicial.”
 

 538 U.S. at 504-05. See also
 
 Lewis v. State,
 
 57 So.3d 807, 821 (Ala.Crim.App. 2009), and
 
 Robitaille v. State,
 
 971 So.2d 43 (Ala.Crim.App.2005).
 

 Reviewing for the first time on appeal a claim of ineffective assistance of counsel relating to counsel’s investigation is particularly difficult. Unlike claims relating to counsel’s actions or inactions during the trial — such as counsel’s failure to object to the admission of certain evidence or failure to request certain jury instructions — which actions or inactions would at least be reflected in the record, counsel’s investigation is conducted entirely outside the courtroom and off the record. Thus, it is difficult, if not impossible, to determine what investigation was even made. In addition, the extent of counsel’s investigation is generally a strategic decision by counsel based on counsel’s knowledge at the time. As the United States Supreme Court noted in
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):
 

 “[Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy
 
 *1068
 
 measure of deference to counsel’s judgments.”
 

 466 U.S. at 690-91. See also
 
 Wiggins v. Smith,
 
 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). The record, however, cannot possibly reflect the decision-making process behind counsel’s investigation, and it is well settled that an ambiguous or silent record will not overcome the strong and continuing presumption that counsel’s conduct was appropriate and reasonable. See, e.g.,
 
 Hooks v. State,
 
 21 So.3d 772, 783 (Ala.Crim.App.2008).
 

 In this case, the record is virtually, albeit not completely, silent regarding counsel’s penalty-phase investigation. As Martin points out, counsel’s billing statements are contained in the record, and the record affirmatively establishes that counsel filed no motions requesting funds for expert assistance or investigative assistance. However, contrary to Martin’s apparent contention, billing statements alone are not sufficient to establish that counsel was ineffective. Additionally, the billing statements reflect more than a mere six hours of investigation, as alleged by Martin. The statements indicate not only seven hours of time spent traveling to and from the prison and discussing with Martin mitigating circumstances, but three telephone calls to possible witnesses for the penalty phase of the trial, as well as numerous hours described only generally as “preparation” for the penalty phase with no further indication as to what that “preparation” entailed. As noted above, counsel called two witnesses to testify on Martin’s behalf at the penalty phase of the trial regarding mitigating circumstances, yet neither of those witnesses is specifically listed in the billing statements. Simply put, we cannot discern from the billing statements alone the extent of counsel’s penalty-phase investigation.
 

 Moreover, although the billing statements here may suggest counsel conducted only a limited investigation for the penalty phase of the trial and the record affirmatively reflects that counsel did not seek funds for investigative or expert assistance, nothing in the record sheds light on why counsel chose to do this. The record does reflect that the trial court granted counsel’s pretrial motion for the State to disclose all mitigating circumstances known to the State, and the billing statements reflect countless hours by counsel reviewing the discovery provided by the State. Pursuant to Rule 10(a)(4), Ala. R.App. P., pretrial discovery is not included in the record; thus, we have no way of knowing what information was included in the State’s discovery or whether that information pertained to mitigating circumstances. Also, Martin has cited no authority, and we have found none, that requires counsel to request funds for expert and investigative assistance in order to provide effective assistance.
 

 “ ‘The reasonableness of counsel’s investigation and preparation for the penalty phase ... often depends critically upon the information supplied by the defendant.’”
 
 Waldrop v. State,
 
 987 So.2d 1186, 1195 (Ala.Crim.App.2007) (quoting
 
 Commonwealth v. Bond,
 
 572 Pa. 588, 609, 819 A.2d 33, 45 (2002)). Here, the record affirmatively reflects that counsel met with Martin for several hours regarding mitigating circumstances; however, the record does not reflect what information, if any, Martin provided to his attorneys regarding mitigating circumstances. In other words, we simply cannot determine whether and to what extent counsel’s investigation was restricted by Martin himself.
 

 Finally, Martin has failed to allege what information could have, or would have, been obtained if counsel had conducted more investigation than they did or how that information would have been
 
 *1069
 
 helpful to him during the penalty phase of the trial. Although Martin makes a bare allegation that his counsel should have obtained his school records and his mental-health records from when he was a child (Martin was 32 years old at the time of the crime), he failed to allege what information was contained in those records that would have been helpful to him during the penalty phase of the trial or how counsel’s failure to obtain those records prejudiced him. “‘A defendant who alleges a failure to investigate on the part of his counsel must allege -with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.’”
 
 Nelson v. Hargett,
 
 989 F.2d 847, 850 (5th Cir.1993) (quoting
 
 United States v. Green,
 
 882 F.2d 999, 1003 (5th Cir.1989)).
 

 Two witnesses testified on Martin’s behalf at the penalty phase of the trial. Counsel argued several mitigating circumstances both to the jury during the penalty phase of the trial and to the trial court during the sentencing hearing. As explained in Part III of this opinion, the trial court found four mitigating circumstances to exist. Based on the record before us, limited as it is with respect to this issue, we cannot say that counsel’s performance with respect to their investigation and presentation of mitigating evidence at the penalty phase of the trial was deficient or that counsel’s performance prejudiced Martin in any way. Therefore, we find no plain error as to this claim.
 

 III.
 

 In accordance with § 13A-5-53, Ala. Code 1975, we will now review the propriety of Martin’s death sentence.
 

 Martin was indicted for and convicted of three counts of capital murder: (1) murdering Darryl Carrillo during the commission of first-degree kidnapping or an attempt thereof, see § 13A-5-40(a)(l), Ala. Code 1975; (2) murdering Johnnie Randolph III during the commission of first-degree kidnapping or an attempt thereof, see § 13A-5-40(a)(l), Ala.Code 1975; and (3) murdering two or more persons, Carrillo and Randolph, by one act or pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Ala.Code 1975. The jury, by a vote of 10-2, recommended that Martin be sentenced to death.
 

 The record reflects that Martin’s sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5~53(b)(l), Ala. Code 1975.
 

 We find no error adversely affecting Martin’s rights during the sentencing proceedings. In its sentencing order, the trial court found the existence of four statutory aggravating circumstances: (1) that Martin committed the murders during the course of kidnapping Carrillo and Johnnie, see § 13A-5-49(4), Ala.Code 1975; (2) that Martin intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct, see § 13A-5-49(9), Ala.Code 1975; (3) that Martin had previously been convicted of another capital offense or a felony involving the use or threat of violence to the person, see § 13A-5-49(2), Ala.Code 1975;
 
 [5]
 
 and (4) that the murders were especially heinous, atrocious, or cruel when
 
 *1070
 
 compared to other capital offenses, see § 13A-5-49(8), Ala.Code 1975, based on the psychological torture of the victims as they were held hostage for some seven hours before their deaths.
 

 The trial court found the existence of one statutory mitigating circumstance: that Martin committed the murders while under the influence of extreme mental or emotional disturbance, see § 13A-5-51(2), Ala.Code 1975 — specifically, the unwanted separation from his wife and child and his belief that his estranged wife was having an extramarital affair. The trial court also found as nonstatutory mitigating circumstances under § 13A-5-52, Ala.Code 1975: (1) that Martin was under the influence of alcohol and cocaine at the time of the murders; (2) that Martin’s family was a dysfunctional family, his parents having died when he was very young and he and his brothers having grown up without an appropriate role model; and (3) that Martin was not highly educated. After weighing the aggravating circumstances and the mitigating circumstances, the trial court found that the aggravating circumstances outweighed the mitigating circumstances and sentenced Martin to death. The trial court’s findings concerning the aggravating and mitigating circumstances are supported by the evidence.
 

 Section 13A-5-53(b)(3), Ala.Code 1975, requires us to determine whether Martin’s death sentence was disproportionate or excessive when compared to the penalties imposed in similar cases. Martin was convicted of two counts of murder during the course of a kidnapping and one count of murder of two or more persons pursuant to one act or one scheme or course of conduct. These offenses are defined by statute as capital offenses. See § 13A-5^40(a)(l) and (a)(10), Ala.Code 1975. This Court has upheld imposition of the death sentence in cases involving these particular capital offenses. See, e.g., cases dealing with murder during the course of a kidnapping:
 
 Lewis v. State,
 
 57 So.3d 807 (Ala.Crim.App.2009),
 
 Sale v. State,
 
 8 So.3d 330 (Ala.Crim.App.2008),
 
 Eatmon v. State,
 
 992 So.2d 64 (Ala.Crim.App.2007),
 
 Flowers v. State,
 
 922 So.2d 938 (Ala.Crim.App. 2005), and
 
 Eggers v. State,
 
 914 So.2d 883 (Ala.Crim.App.2004), and the cases cited therein; and cases dealing with the murder of two or more persons:
 
 Jackson v. State,
 
 [Ms. CR-06-1398, December 18, 2009] — So.3d-(Ala.Crim.App.2009),
 
 Harris v. State,
 
 2 So.3d 880 (Ala.Crim. App.2007),
 
 Washington v. State,
 
 922 So.2d 145 (Ala.Crim.App.2005),
 
 Snyder v. State,
 
 893 So.2d 488 (2003),
 
 Broadnax v. State,
 
 825 So.2d 134 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001), and
 
 Freeman v. State,
 
 776 So.2d 160 (Ala.Crim.App.1999), aff'd, 776 So.2d 203 (Ala.2000), and the cases cited therein. Considering the crime committed and Martin, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. Moreover, after independently weighing the aggravating circumstances and the mitigating circumstances, we agree with the trial court that the aggravating circumstances outweigh the mitigating circumstances and that death is the proper sentence in this case. See § 13A-5-53(b)(2), Ala.Code 1975.
 

 Finally, as required by Rule 45A, Ala. RApp. P., we have thoroughly examined the record for any error that may have adversely affected Martin’s substantial rights with respect to Martin’s capital-murder convictions and his sentence of death, whether or not brought to our at
 
 *1071
 
 tention or to the attention of the trial court. We find no plain error or defect in the proceedings.
 

 Based on the foregoing, Martin’s capital-murder convictions and his sentence of death are affirmed.
 

 AFFIRMED.
 

 WISE, P.J., and WELCH, WINDOM, and MAIN, JJ., concur.
 

 [1]
 

 . This case was originally assigned to another judge on this Court. It was reassigned to Judge Kellum on January 27, 2009.
 

 [2]
 

 . Martin was also indicted for three additional charges of kidnapping in the first degree, violations of § 13A-6-43, Ala.Code 1975, with respect to Alicia Dixon, Amari Dixon, and Nakayla Randolph. The jury also found Martin guilty of these three charges. However, Martin did not file a notice of appeal with respect to these convictions; therefore, they are not before us in this appeal.
 

 [3]
 

 . Ogletree was not charged with any crimes relating to this incident.
 

 [4]
 

 . The report of the State’s psychiatrist indicates that Martin attended therapy for approximately one year when he was approximately 11 or 12 years old, around the time of his parents’ deaths.
 

 [5]
 

 . The record reflects that Martin had three prior convictions — a 1993 conviction for robbery in the second degree; a 2006 conviction for escape in the first degree; and a 2006 conviction for attempted murder. Although the acts underlying the 2006 convictions for escape and attempted murder occurred after the acts underlying his capital-murder convictions (Martin escaped from prison after his arrest on the capital-murder charges), “where the defendant in a capital felony trial has been convicted of a ‘felony involving the use or threat of violence to the person' at any time prior to the sentencing phase of his
 
 *1070
 
 capital felony trial, this other felony can be used as an aggravating circumstance, even if it was perpetrated after the capital offense for which the defendant is being sentenced."
 
 Coulter v. State,
 
 438 So.2d 336, 347 (Ala.Crim.App.1982), aff'd, 438 So.2d 352 (Ala.1983).